UNITED STATES of America,
Plaintiff-Appellee,

v.

Jerome SANDY and American International Pictures Exchange of Washington, D. C., Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Ellis GORDON, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Marvin ZIDE and Allied Film Exchange, Inc., Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

John O. GLAUS, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Marvin FRIEDLANDER and Marvin Films, Defendants-Appellants.

Nos. 77–5367 to 77–5371.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 12, 1978.

Decided July 27, 1979.

James F. Neal, Neal & Harwell, Thomas H. Dundon, Nashville, Tenn., for defendant-appellant in No. 77–5367.

M. Anderson Cobb, Jr., Manire, Harris, Shelton & Dunlap, Memphis, Tenn., Robert F. Sylvia, Fine & Ambrogne, Boston, Mass., for defendant-appellant in No. 77–5368.

William D. Evans, Jr., Montedonico, Heiskell, Davis, Glankler, Brown & Gilliland, Memphis, Tenn., Robert F. Sylvia, Fine & Ambrogne, Boston, Mass., for defendant-appellant in No. 77–5369.

Ralph J. Cappy, Pittsburgh, Pa., Robert F. Sylvia, Fine & Ambrogne, Boston, Mass., for defendant-appellant in No. 77–5370.

Albert C. Harvey, Thomason, Crawford & Hendrix, J. Kimbrough Johnson, Memphis, Tenn., for defendant-appellant in No. 77–5371.

Larry E. Parrish, Sp. Asst. U. S. Atty., Memphis, Tenn., for plaintiff-appellee.

Before ENGEL and KEITH, Circuit Judges and PECK, Senior Circuit Judge.

ENGEL, Circuit Judge.

Appellants were convicted in a non-jury trial of conspiring to distribute an obscene

film, "School Girl", in interstate commerce, in violation of 18 U.S.C. §§ 371 and 1462 (1976). Their principal claim in this appeal is that they were prejudiced because the case was tried under the obscenity standards of *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), only to be decided later by the trial judge under pre-*Miller* standards.

We hold upon the record before us that there was no prejudice which affected the substantial rights of the appellants and, finding no other error in the trial, affirm the convictions.

The indictment, returned by a federal grand jury in Memphis, Tennessee, on February 15, 1973, charged 25 individuals and organizations with conspiring to distribute "School Girl" in interstate commerce. The detailed allegations of the indictment and the overt acts expressly incorporated in it described activity which commenced with the production of the motion picture by certain of the conspirators, the sale of the rights in the movie to the defendant Sherpix for a total of $41,000, and the subsequent distribution for public exhibition of the film throughout the country by means of the various services offered by the remaining named defendants. The conspiracy charge, which was embraced in count 1 of the indictment, was fortified by five additional counts in which certain of the conspirators were charged with the substantive offenses of shipping the film in interstate commerce by use of a common carrier, contrary to 18 U.S.C. §§ 1462 and 2.

Of the 25 defendants charged in the conspiracy count, 15 waived jury and elected to be tried before the district judge. Seven other defendants, including all who were tried on the substantive charges, proceeded to trial by jury immediately following the

non-jury trial of the appellants involved here.[1]

All of the defendants who insisted upon their right to jury trial were acquitted on the conspiracy count but were found guilty of the several substantive offenses charged against them.[2] Conversely in the non-jury trial before District Judge Robert M. McRae, Jr., three defendants were acquitted and the remaining twelve were convicted, eight of whom have appealed here.

I.

In the non-jury trial held January 5–6, 1976, District Judge Robert M. McRae, obedient to our circuit's decision in *United States v. Marks,* 520 F.2d 913 (6th Cir. 1975) (*Marks I*), considered that his determination of the issue of obscenity was to be governed by the standards set forth in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), although all events alleged in the indictment occurred before *Miller* was decided. However, after the trial of the case but before filing his decision and entering judgment, the district judge learned that the Supreme Court had granted certiorari in *Marks, supra,* and accordingly delayed further proceedings in the case until the appeal was decided. On March 1, 1977, the Supreme Court held that persons indicted for conduct occurring before *Miller* were entitled to all of the benefits which *Miller* might confer, but were also entitled to application of the pre-existing *Roth-Memoirs*[3] test of obscenity, which primarily provided that materials could not be found to be obscene unless they were "utterly without redeeming social value." *Marks v. United States,* 430 U.S. 188, 196–97, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (*Marks II*). On July 28, 1977, approximately five months after the Supreme Court's

---

1. As for the remaining three alleged conspirators, John O. Glaus Agency was not tried, although appellant John O. Glaus, individually, was tried and convicted. Paul David Gerber a/k/a David Reberg, one of the conspirators responsible for the production of "School Girl," apparently was not apprehended and brought to trial. A third defendant, Bernard Levy, was dismissed by an order of *nolle prosequi.*

2. The trial court later ordered new trials because the jury had been erroneously charged on the definition of obscenity.

3. *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); *Memoirs v. Massachusetts,* 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966).

decision in *Marks II,* Judge McRae filed his findings of fact and conclusions of law. Applying both the *Miller* and *Roth-Memoirs* tests,[4] he adjudged the film to be obscene and found the appellants guilty.

As noted in *Hamling v. United States,* 418 U.S. 87, 99, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), the definition of obscenity announced in *Roth* was substantially refined by the plurality opinion in *Memoirs v. Massachusetts,* 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966). To fall outside constitutional protection under *Memoirs,* "it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value." 383 U.S. at 418, 86 S.Ct. at 977.

*Miller v. California, supra,* revised the *Roth-Memoirs* test determining obscenity in the following language:

(a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest . . . . ;

(b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and

(c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific values.

*Miller v. California, supra,* 413 U.S. at 24, 93 S.Ct. at 2615. The standards announced in *Miller* were made applicable to federal obscenity trials in *United States v. 12 200-ft. Reels of Film,* 413 U.S. 123, 129–30 & n. 7, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973).

No appellant has disputed the trial judge's factual description of the content of "School Girl":

The school girl portrayed in the movie is a college student who undertakes to research a sex subculture. In order to do this she responds to certain classified ads in the college underground newspaper. This leads to a series of sexual episodes which include having sexual intercourse with a husband under the wife's direction and ultimate participation as a third party, mutual masturbation pursuant to direction from a man over the telephone, sexual intercourse oral and otherwise with a father and son team, and a group sex orgy. In addition, there are episodes in which complete actual and prolonged sexual intercourse between the school girl and her boyfriend is shown. There is a similar episode portrayed between the school girl's female roommate and the school girl's male professor who called at their apartment to inquire about the welfare of the school girl. In addition the school girl and her female roommate are shown in a prolonged lesbian episode.

All episodes show close shots of the genitals of the participants during the sexual encounters.[5]

No party has claimed that under either test the film is constitutionally protected as a matter of law.[6] The issue, therefore, is

---

**4.** The appellants' claim that the trial court in fact only applied the *Miller* test is not correct.

**5.** Upon express inquiry by the court at oral argument, all parties expressed the opinion that it was not necessary to the appeal that the judges view the film. *See United States v. Marks,* 585 F.2d 164, 171 (6th Cir. 1978) *(Marks III).* We therefore accept the trial court's account as accurate.

**6.** It seems to be characteristic of this kind of case that it is susceptible to many hypothetical dangers—dangers that innocent and unsuspecting defendants will be swept into the conspir-

acy dragnet, and dangers arising out of a very justifiable sensitivity to First Amendment rights. *See, e. g. Paris Adult Theatre I v. Slayton,* 413 U.S. 49, 83–101, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) (Brennan, J., dissenting). Nevertheless, on a case-by-case basis, those dangers turn out to be more theoretical than real, for rarely is it argued with any force that the material in question is as a matter of law not obscene, and that claim is not made here. One reason for this, we suspect, is that where material has any remote relation to the values protected by the obscenity tests, a generally tolerant society tolerates it in all events. A second, more important reason, we suspect, is

whether any prejudice affecting the substantial rights of the defendants occurred because the case was tried under the *Miller* standards, but was finally decided under both *Miller* and pre-*Miller* standards.

■ We conceive that prejudice to substantial rights could exist by a midstream change in the rules such as occurred here.[7] We are, however, unable realistically to conceive of any prejudice upon this record.

■ Having lost below, all appellants indicate in this appeal that they wish to have a new trial based upon pre-*Miller* standards. There is, however, no complaint that the district court erred in excluding any evidence proffered by the defendants, although they now claim that the making of an offer of proof would have been an expensive and futile gesture in view of the court's pretrial ruling that *Roth-Memoirs* would not be applied. *But see* Rule 103(a)(2), Fed.R.Evid. While there was some suggestion on appeal that certain of the defendants might have wished, as a matter of afterthought, to introduce further expert testimony on the obscenity question and its application under pre-*Miller* standards, nothing concrete has been offered or even suggested which would indicate how the defendants would have conducted themselves differently, had it been known at the time of trial that pre-*Miller* standards were still applicable.

More particularly, certain appellants, notably Gordon, complain that the submission of the case on the *Miller* standards denied them an opportunity to "present evidence or argue that the film did not violate the *Memoirs* test, particularly the last part, requiring that the material be 'utterly without redeeming social value' for it to be found obscene." The simple answer to this, as we mentioned above, is that no offer was

ever made, although many months elapsed from the date of trial due to the trial court's decision to wait for further guidance from the Supreme Court. More particularly, despite an interval of nearly five months between the Supreme Court's decision in *Marks* and Judge McCrae's opinion, not one defendant sought any right to re-argue the case under the old standards, or to submit additional evidence or to make any offer of proof as to what additional evidence he wished to submit, once the standard had been clarified. We can only view this, therefore, as an effort to obtain a second bite of the apple, and not as any claim of serious prejudice to any right of fair trial.

A somewhat similar problem arose in *Hamling v. United States, supra,* when it appeared that the instructions given by the district court in the jury case made occasional reference to the community standards of the "nation as a whole," thereby delineating a wider geographical area than normally would have been warranted by *Miller:*

> In the unusual posture of this case, in which petitioners agree that the challenged instruction was proper at the time it was given by the District Court, but now seek to claim the benefit of a change in the law which casts doubt upon the correctness of portions of it, we hold that reversal is required only where there is a probability that the excision of the references to the "nation as a whole" in the instruction dealing with community standards would have materially affected the deliberations of the jury. [citations omitted] Our examination of the record convinces us that such a probability does not exist in this case.

*Hamling, supra,* 418 U.S. at 108, 94 S.Ct. at 2903. Of course, the likelihood of prejudice is even less in the instant case than in

---

that the commercial marketability of obscene materials depends in major part upon the very absence of those qualities which lift that material into the area of First Amendment protection.

**7.** Judge McRae, in fact, for this reason set aside the jury conviction of the co-defendants and ordered a new trial under pre-*Miller* standards.

There is, however, a substantial difference between the defendants tried to the jury and those who opted for trial to the court. The jury had been charged only according to *Miller* standards, while the judge in the bench trial expressly evaluated the film under both *Miller* and *Roth-Memoirs.*

*Hamling,* since Judge McRae, as trier of fact, properly recognized and applied both the *Miller* and *Roth-Memoirs* tests in judging the obscene nature of the film.

We are convinced that under the circumstances here, neither the parties' trial strategy, their decision to have waived a jury, nor the trial judge's consideration of the evidence, were adversely affected by the fact that the case was tried upon the understanding of the law prevailing in our circuit and decided on a somewhat variant and later construction announced by the Supreme Court. Had the record shown some meaningful distinction which could have affected the result here and which would render it unfair for the parties to be bound by the trial court's decision, we would not hesitate to reverse. Such is not the state of the record here.

## II.

Each appellant argues, in one form or another, that he is entitled to acquittal as a matter of law because the evidence was insufficient to connect him with one common enterprise which would qualify as a criminal conspiracy. As indicated earlier, the jury trial of the remaining defendants named in the indictment followed the non-jury trial before Judge McRae here and resulted in acquittal of the defendants therein of the conspiracy charge, although they were found guilty on substantive counts of transporting obscene material in interstate commerce by use of a common carrier. It is the claim of appellants that the government alleged a "wheel" type of conspiracy in which Art Theatre Guild and its subsidiary, Sherpix, as the owner and original distributor of the movie, were the hub, and in which the appellants, if anything, were merely spokes of the wheel having no relationship one to the other except through their common relationship with Sherpix and Art Theatre Guild. Because Sherpix and Art Theatre Guild were acquitted of the charge of conspiracy in the jury trial, the defendants reason that they must likewise be acquitted since it has been adjudicated through the acquittal, they claim, that Sherpix and Art Theatre Guild were not conspirators.

They place reliance upon a number of decisions which in effect hold that where all other alleged co-conspirators are acquitted of a conspiracy, the conviction of one person on that charge cannot be upheld, since it takes at least two to commit the offense. *E. g., United States v. Williams,* 503 F.2d 50, 54 (6th Cir. 1974). *See also United States v. Lester,* 363 F.2d 68, 72 (6th Cir. 1966), *cert. denied,* 385 U.S. 1002, 87 S.Ct. 705, 17 L.Ed.2d 542 (1967). However this may be, and there is indeed much authority to the contrary commencing with *Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932) (Holmes, J.), and proceeding through *Hamling v. United States, supra,*[8] our careful examination of the record here persuades us that in all events, the essential link in the conspiracy was not missing here. Unindicted but named co-conspirator Saul Shiffrin, Executive Vice President of Sherpix and Art Theatre Guild, supplied that link in ample measure and it was his testimony which connected the defendants one to another and laid the cornerstone of the successful prosecution of the conspiracy. The indictment alleged and the proofs showed numerous overt acts undertaken by Shiffrin, notably arranging to transport the film into and out of the district of trial and contracting for the sub-distribution of "School Girl" with the defendants.

The court, sitting as a trier of fact, specifically found that a conspiracy existed between the appellants and Shiffrin. Shiffrin's testimony, which was introduced at

---

**8.** "It has, of course, long been the rule that consistency in verdicts or judgments of conviction is not required." 418 U.S. at 101, 94 S.Ct. at 2899. *See also United States v. Rowan,* 518 F.2d 685, 689 (6th Cir.), *cert. denied,* 423 U.S. 949, 96 S.Ct. 368, 46 L.Ed.2d 284 (1975) ("[a] jury is free to render inconsistent verdicts or to employ relevant evidence in convicting on one count that it may seem to have rejected in acquitting on other counts."); *United States v. Fleming,* 504 F.2d 1045, 1055 (7th Cir. 1974); *Developments in the Law—Criminal Conspiracy,* 72 Harv.L.Rev. 920, 974 & n. 401 (1959).

trial through his affidavit, amply supports that finding. *United States v. Shipp*, 359 F.2d 185 (6th Cir.), *cert. denied*, 385 U.S. 903, 87 S.Ct. 213, 17 L.Ed.2d 134 (1966). Likewise, it is immaterial that Shiffrin was not himself charged in the indictment; he was named as an unindicted co-conspirator and the evidence at trial connected him with the conspiracy. *Feldstein v. United States*, 429 F.2d 1092, 1095 (9th Cir.), *cert. denied*, 400 U.S. 920, 91 S.Ct. 174, 27 L.Ed.2d 159 (1970). *See also Developments in the Law—Criminal Conspiracy*, 72 Harv. L.Rev. 920, at 972–73 (1959).

■■■ It is a well-established general rule that inconsistent jury verdicts are not fatal to a conviction, they being "one of the consequences which we accept under our jury system," *Miller v. California*, 413 U.S. at 26 n. 9, 93 S.Ct. at 2616. *See also Dunn, supra*, 284 U.S. at 393–94, 52 S.Ct. 189, and *Hamling, supra*, 418 U.S. at 100–01, 94 S.Ct. 2887. In view of this authority we think that the rule in *Williams* and like cases is necessarily confined to those circumstances in which the allegations of the indictment and the proofs at trial admit of no other conspiratorial agreement than that existing between the one convicted defendant and other conspirators, all of whom have been acquitted of the specific charge. *Developments, supra*, 72 Harv.L.Rev. at 972–73, and cases cited therein. This circumstance does not exist in the instant case.

Allied with the claim of insufficiency of the evidence is the claim of several of the defendants that not one but several conspiracies were shown because the proofs indicated only individual, isolated agreements to acquire and display the film, rather than the single, unified conspiracy, which appellants claim is necessary to their joint trial and conviction. Essentially the defendants rely upon *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and its justifiable concern that in conspiracy cases the defendants have a right "not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others . . . ." *Id.* at 775, 66 S.Ct. at 1253. *See also United States v. Mayes*, 512 F.2d 637, 642–43 (6th Cir.), *cert. denied*, 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 & 423 U.S. 840, 96 S.Ct. 69, 46 L.Ed.2d 59 (1975). If anything, the conspiracy here alleged and proved has a singular unity in its confinement to the distribution in interstate commerce of but one film. It is apparent that by narrowly describing the conspiracy, many of the legitimate apprehensions of injustice reflected in *Kotteakos* were avoided. As the trial court noted in its findings of fact:

> Because there are a limited number of copies of the film, it is understood and agreed by those members of the distribution network that they will ship the copies to other areas (interstate) when directed to do so by the owner or distributor of the film. The proof reflects that this was not only agreed to but was done by some of the sub-distributors. . . .

> Furthermore, the sub-distributors and the distributor were financially interested in an efficient and systematic method of making the copies available when and where needed.

The interdependence of the sub-distributors and their agreement to act in concert with one another in the circulation of the film provided the "rim of the wheel" and thus tied them together in a single criminal undertaking. *Kotteakos, supra*, 328 U.S. at 755, 66 S.Ct. 1239; *Mayes, supra*, 512 F.2d at 642–43; *United States v. Varelli*, 407 F.2d 735, 741–42 (7th Cir. 1969), *appeal after remand*, 452 F.2d 193 (7th Cir. 1972), *cert. denied*, 405 U.S. 1040 (1973). It, therefore, appears to us from the evidence here that one conspiracy was shown to have existed, a conspiracy to participate in the interstate distribution and showing, for profit, of "School Girl." [9]

---

9. It might be that the defendants, or some of them, were equally guilty of conspiring to distribute other obscene films and that conduct was also a part of the "School Girl" conspiracy. That, however, need not concern us here. Defendants could not be injured if the government elected to confine itself to the narrower aspects of a single conspiracy.

## III.

■ Appellants also claim that the acquittal of Sherpix, Art Theatre Guild, and sub-distributor Gordon Craddock and Craddock Films, *inter alia,* in the earlier jury trial as a matter of law deprived the Western District of Tennessee of venue since "all allegations of overt acts committed in the Western District of Tennessee are those of Sherpix, Inc., Art Theatre Guild, Inc., Gordon Craddock and Craddock Films, Inc." The claim is simply without factual support in the record. The indictment also alleged, *inter alia,* overt acts committed by unindicted co-conspirator Shiffrin, and the evidence supported those allegations. More fundamentally, however, we do not view the acquittal of Sherpix, Art Theatre Guild, Craddock and Craddock Films on the conspiracy charge as conclusive evidence that, for the purposes here, they did not actually commit the overt acts charged to them in the indictment. *See United States v. Samuel Dunkel & Co.,* 184 F.2d 894, 898 (2d Cir. 1950), *cert. denied,* 340 U.S. 930, 71 S.Ct. 491, 95 L.Ed. 671 (1951). In fact, all four were convicted on substantive counts which formed the basis of the overt acts alleged to have been committed by them in the conspiracy count.

■ We know of no rule which obliges a trier of fact to disregard the evidence relating to a defendant who has been acquitted of a particular crime in the trial of a co-defendant. As earlier mentioned, the rule in *Williams, supra,* relied upon by defendants, is not a rule of evidence but of sufficiency. Therefore, where the sufficiency is fully shown by the participation of unindicted co-conspirator Saul Shiffrin, that issue is at an end.

■ The proofs clearly show several overt acts occurring in the Western District of Tennessee. The trial court specifically found that "Sherpix and Art Theatre Guild, acting through its authorized employees caused 'School Girl' to be shipped in interstate commerce to Memphis, Tennessee (Western District of Tennessee) on or about March 1, 1972." Shiffrin's testimony indicates he personally arranged for the transportation of the film into Memphis. On June 15, 1972, Sherpix caused a print of "School Girl" to be shipped by common carrier from Memphis to appellant Allied Film Exchange in Detroit, and again on June 5, 1972, Gordon Craddock, at the direction of Shiffrin, caused a print of the movie to be shipped by interstate commerce to Memphis and subsequently to Springdale, Arkansas, from Memphis. Venue for the conspiracy count was properly laid in the Western District of Tennessee. *Hyde v. United States,* 225 U.S. 347, 365–67, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); Rule 18, Fed.R.Crim.P.

Closely allied to the foregoing argument is the claim that the various defendants were unfairly tried in Memphis because the allegedly puritanical local standards of that community subjected them to judgment of guilt based upon standards which might not exist in the several other areas of the country where they had displayed or circulated the film. We view this claim as but another facet of the same venue argument.

■ Once the conspiracy to which they belonged was shown to have extended to and operated in Memphis, the defendants had no right to have the obscenity of the film tried according to the community standards of other localities in which they might conceive public attitudes to be more permissive. In *Art Theatre Guild, Inc. v. Parrish,* 503 F.2d 133 (6th Cir. 1974), *cert. denied,* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975), wherein we ruled on a motion for return of the same seized film, we observed:

> The Supreme Court in *Hamling v. United States,* . . . touches on this problem [prosecution of a nationwide conspiracy case] and indicates how a district judge sitting in one district can handle the "contemporary community standard" requirement when faced with a federal prosecution and the need to consider its application in several districts.

*Id.* at 137. *Hamling* indicates that even where a federal obscenity offense is multistate in its scope, the community standards of the locality of trial, not some "hypothetical and unascertainable" nationwide standards, are to be applied:

A juror is entitled to draw on his own knowledge of the views of the average person in the community or vicinage from which he comes for making the required determination, just as he is entitled to draw on his knowledge of the propensities of a "reasonable" person in other areas of the law.

\* \* \* \* \* \*

The result of [*Miller v. California* and companion cases], therefore, as a matter of constitutional law and federal statutory construction, is to permit a juror sitting in obscenity cases to draw on knowledge of the community or vicinage from which he comes in deciding what conclusion "the average person, applying contemporary community standards" would reach in a given case. Since this case was tried in the Southern District of California, and presumably jurors from throughout that judicial district were available to serve on the panel which tried petitioners, it would be the standards of that "community" upon which the jurors would draw.

418 U.S. at 104, 105–06, 94 S.Ct. at 2901.

■ While the appellants have not argued that the nationwide scope of the conspiracy requires application of a national standard in judging the film, they claim that the trial court should have applied a multitude of local standards, depending upon the distribution area which each conspirator served. This is not the law under either *Miller* or pre-*Miller* standards, as *Miller* and *Hamling* clearly demonstrate. *Hamling* contemplates that persons guilty of substantive offenses which overlap judicial districts subject themselves to the application of varying local standards, depending upon the locality of trial, and we see no reason to devise a different rule for multistate conspiracies:

The fact that distributors of allegedly obscene materials may be subjected to varying community standards in the various federal judicial districts into which they transmit the materials does not render a federal statute unconstitutional because of the failure of application of uniform national standards of obscenity. Those same distributors may be subjected to such varying degrees of criminal liability in prosecutions by the States for violations of state obscenity statutes; we see no constitutional impediment to a similar rule for federal prosecutions. In *Miller v. California*, 413 U.S., at 32, [93 S.Ct. 2607,] we cited with approval Mr. Chief Justice Warren's statement:

"[W]hen the Court said in *Roth* that obscenity is to be defined by reference to 'community standards,' it meant community standards—not a national standard, as is sometimes argued. I believe that there is no provable 'national standard,' and perhaps there should be none. At all events, this Court has not been able to enunciate one, and it would be unreasonable to expect local courts to divine one. It is said that such a 'community' approach may well result in material being proscribed as obscene in one community but not in another, and, in all probability, that is true. But communities throughout the Nation are in fact diverse, and it must be remembered that, in cases such as this one, the Court is confronted with the task of reconciling conflicting rights of the diverse communities within our society and of individuals." *Jacobellis v. Ohio*, 378 U.S. 184, 200–201, [84 S.Ct. 1676, 12 L.Ed.2d 793] (1964) (dissenting opinion).

*Hamling, supra,* 418 U.S. at 106–07, 94 S.Ct. at 2902. Having voluntarily chosen to enter a conspiracy of national scope, appellants limited their right to be tried according to the standards of the localities in which their operations are centered.

■ A related claim is appellants' assertion that the district court abused its discretion in failing to permit introduction of evidence concerning the standards of communities outside the Western District of Tennessee. It is true that prior to trial counsel for Gordon indicated a desire to offer evidence concerning the prevailing standards of New England, to which the trial judge replied, "I don't think we need

any proof along those lines." This ruling was made in advance of the trial and counsel never stated what proof they intended to offer into evidence, nor was any formal offer of proof made at trial. Assuming, without deciding, that the pretrial offer and the judge's ruling were sufficient to preserve the issue for review at this stage, *but see* Fed.R.Evid. 103(a)(2), we nevertheless read *Hamling* as leaving such decisions largely to the discretion of the trial judge,[10] a discretion which we find was not abused under the circumstances here.

## IV.

■ Appellants Sandy and Friedlander particularly complain that the evidence was insufficient to uphold the district court's finding that they possessed the requisite scienter concerning the nature of the film. No claim is made that the district court misapprehended the governing legal principles. In this respect the trial judge correctly followed *Hamling* to observe that "it is not necessary for the government to prove that the conspirators had actual knowledge that the film was obscene. The scienter required to support a conviction is that they knew the general nature and character of the films." *See Hamling, supra,* 418 U.S. at 123, 94 S.Ct. 2887.

■ While necessarily circumstantial, the evidence nevertheless strongly supports the trial judge's finding in this respect. The evidence indicated extensive discussions between Shiffrin and the de-

fendants with respect to the film and its display elsewhere. The finder of fact, whether trial judge or jury, is not obliged to lay aside his general knowledge of life in evaluating the evidence and the several communications which were a part of the evidence. There was proof that some of the appellants handled other sexually explicit films for Sherpix. There was evidence that, as part of his sales pitch, Shiffrin represented to each sub-distributor that the film had been shown at the Lido East and Cini Lido in New York, known in the industry as theaters specializing in the exhibition of X-rated films. The defendants knew that the film was itself X-rated.[11] While some X-rated films may not be obscene, it asks too much of credulity to expect that under the circumstances the defendants could not have known of the general nature and character of "School Girl," even though there may not have been proof that they actually viewed the film. There is thus substantial evidence to support the trial judge's finding that these defendants possessed the necessary degree of scienter.

## V.

■ Finally, appellant Friedlander claims that his constitutional right to a speedy trial was violated in the delay between the return of the indictment in February, 1973 and the trial before Judge McRae in January, 1976. He claims particular prejudice stemming from the death of

10. After holding that the trier of fact in a federal obscenity prosecution should draw upon the community standards of the vicinage of trial, *Hamling* noted:

> [b]ut this is not to say that a district court would not be at liberty to admit evidence of standards existing in some place outside of this particular district, if it felt such evidence would assist the jurors in the resolution of the issues which they were to decide.

418 U.S. at 106, 94 S.Ct. at 2902.

11. Although Sandy asserts that there is no evidence that an X-rating generally contemplates sexually explicit material, we find applicable to the trial judge's role in non-jury cases the same observations we made with respect to a jury's general knowledge in *United States v. Jones,* 580 F.2d 219 (6th Cir. 1978).

> While Wigmore notes that "[t]he range of [a jury's] general knowledge is not precisely definable," [9] *Wigmore [on Evidence]* § 2570 at 546 [(3d ed. 1940)], "the scope of this doctrine is narrow; it is strictly limited to a few matters of elemental experience in human nature, commercial affairs, and everyday life." *Id.* at 544. This category of fact is not so much a matter of noticing facts outside the record as it is a matter of the communication value of the words used, which can only be understood in the light of the common experience of those who employ them. *See generally* K. Davis, Administrative Law Text § 15.06 at 305 (3d ed. 1972). *Id.* at 222. The trial court did not err in its understanding of the term, "X-rated."

the other principal employee, besides himself, of Marvin Films, who, it is claimed, would have testified at the trial. No effort is made to show how the four-pronged test of *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), applied here, would produce a holding of constitutionally impermissible delay, and we find none.

The remaining allegations of error are mostly variations of those already discussed. We find no merit in them.

Affirmed.