UNITED STATES of America,
Plaintiff–Appellee,

v.

Heller C. BOLING a/k/a Connie Boling (88–3130); Thomas A. Lauback (88–3216), Defendants–Appellants.

Nos. 88–3130, 88–3216.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 15, 1988.

Decided March 15, 1989.

John M. DiPuccio (argued), Office of the U.S. Atty., Cincinnati, Ohio, for U.S.

Daniel A. Brown (argued), Porter, Wright, Morris & Arthur, Columbus, Ohio, for Boling.

William J. Abraham (argued), Columbus, Ohio, for Lauback.

Before ENGEL, Chief Judge, WELLFORD, Circuit Judge, and THOMAS *, Senior District Judge.

PER CURIAM.

This is a lengthy case involving two defendants charged with conspiracy and a number of counts of mail and wire fraud. The first defendant, Thomas Andrew Lauback, was president and sole owner of DuraSeal, Inc., a company organized for the purpose of selling "asphalt sealer" dealerships throughout the country. DuraSeal was established on or about September 1, 1980, and was headquartered in Columbus, Ohio.[1]

The second defendant, Heller C. "Connie" Boling, worked as a salesperson for DuraSeal from August 1981 until March 1985. Boling met Lauback in the late–1970s when her husband worked for one of Lauback's other companies. She joined DuraSeal after Lauback asked her to do some marketing research for the company. She lived in Wilmington, North Carolina, and represented DuraSeal at various trade and franchise shows across the country.

---

* The Honorable William K. Thomas, United States District Court for the Northern District of Ohio, sitting by designation.

1. Lauback also operated a separate business called Technical Communications, Inc. (TCI), which was formed in April 1980.

The trial record also indicates that Boling met with individuals interested in purchasing DuraSeal dealerships, signed dealership agreements on behalf of the company, negotiated with a K–Mart representative in an attempt to secure a national contract, and attended and spoke at dealer training programs in Florida. Boling was DuraSeal's most successful salesperson, selling approximately half of the company's dealerships. She worked on a commission and travel expense reimbursement basis.

During the early years of the company, DuraSeal offered dealerships for approximately $10,000. Later, dealerships were sold for as much as $40,000 ($15,000 went directly to DuraSeal; the remainder was paid to an independent leasing agent for a special 550–gallon truck and equipment). A dealer purchased a "package" which was supposed to include a "state-of-the-art" GMC truck modified for seal coating, an exclusive territory, on-site training, "DuraSeal's exclusive patented K–10 liquid emulsion additive," a sales and marketing program, stationery and business cards, uniforms, and truck accessories.

DuraSeal attracted potential dealers by advertising in newspapers and by participating in various trade shows. At the trade shows, the DuraSeal representative would hand out brochures to prospective dealers and answer inquiries. Those interested in DuraSeal would be contacted over the phone by a salesperson, who would usually arrange for a personal interview. Once an agreement was executed, the new dealer would wire a downpayment to DuraSeal in Columbus.

DuraSeal's brochure stated:

DuraSeal is the acknowledged leader in the rapidly growing seal coating industry. Our network of dealers includes successful business operators in the U.S. A. and Canada. DuraSeal owners represent people from all walks of life—from lawyers to farmers, from doctors to retailers.

It also indicated that DuraSeal provided training, marketing, and promotional services. DuraSeal represented that net profits might average 90%, that a "return on investment" was "less than one year," that overhead was low, and that "[no] special skills or experience are needed to operate the DuraSeal equipment or to effectively merchandise your product." DuraSeal indicated it would provide continuing services, such as "a written tracking report of your business operation and personnel." The brochure states that the "equipment is a one-man operation so a residential drive can be finished in 15 to 30 minutes; for commercial, the equipment is capable of 1,000,000 square feet per day." The brochure also contained a "fact sheet" showing average costs and times per job.[2]

During her sales efforts, Boling would urge prospective customers to buy a dealership promptly in order to avoid a franchising fee. Boling told people that DuraSeal would be conducting nationwide advertising campaigns as soon as it was franchised, and that dealers might receive asphalt sealing contracts from established accounts in their territory, such as Wendy's and K–Mart. Potential purchasers were told that while there were successful dealers around the country there were very few failures, and were given various names to contact.[3]

Despite the fact that more than 100 DuraSeal dealerships were sold, DuraSeal ceased operations in 1985 due to problems with creditors and dealers and an accumulated debt of $463,000.[4] The indictment

2. The fact sheet was prepared by Joan Lauback, Thomas Lauback's ex-wife and DuraSeal's former director of marketing.

3. Names furnished were those of dealers or nondealer friends of Lauback, most of whom received commissions for each reference.

4. At some point, Lauback changed the company's address and phone number to Wilmington, North Carolina. (DuraSeal offices, however, remained in Columbus.) Although the phone number and address were Boling's, Lauback testified that Boling never received company mail because it was forwarded directly to Columbus, and that Boling never handled company phone calls because the phone was set on call forwarding and would ring only in Columbus. These steps were taken to avoid dealer complaints and problems with the Better Business Bureau.

returned in 1986 alleged that the defendants engaged in a scheme and conspiracy to defraud by fraudulently inducing individuals to purchase DuraSeal dealerships, and charged them with twenty-seven mail and wire fraud counts.

The government called fifty-one DuraSeal dealers as witnesses, virtually all of whom had lost money in their first year, and a majority of whom had gone out of business. Most of the dealers testified that an appeal was made to invest immediately because of anticipated future franchising. Many testified that they never received on-site training, the marketing package, or the special K–10 additive. Others also testified that they never received their truck or equipment or it arrived late or in defective condition. Some dealers claimed that the equipment was used rather than new, and required constant repair. Despite complaints about these circumstances, their money was never refunded. Several dealers further complained that when other dealers encroached on their "exclusive" territory, Lauback made no effort to correct the situation. Most noted that the time and cost estimates contained in the fact sheet were distinctly incorrect and exaggerated. In sum, the dealers testified that once they signed the contract and paid the fee, they were left largely on their own. The company provided little training, and Lauback was almost impossible to contact.

One former DuraSeal salesperson, Gordon Reel, testified that he worked for Lauback for eight months and sold sixteen dealerships. He stated that when he contacted Lauback with dealer problems or complaints, Lauback usually said that he would take care of them. Boling allegedly told Reel that she was Lauback's "very close associate." Finally, Reel testified that he left DuraSeal because he was concerned about Lauback's disregard of dealer problems, the financial condition of the company, and nonpayment of his commissions and expenses.

During the middle of the trial, Boling requested an in camera conference with the district judge, asking for permission to discharge her attorney, Bob Zitko, on grounds of conflict of interest, failure to represent her interests during trial, and their mutual inability to communicate and agree on her defense. Boling explained to the judge that she had retained Mr. Zitko at the suggestion of Lauback, and that she initially understood that Zitko had represented Lauback only in an unrelated child support proceeding. During the course of the trial, however, Boling discovered that Zitko also represented Lauback in a related FTC case.[5] When the judge asked Zitko about Boling's allegations, Zitko responded:

I don't represent Mr. Lauback in any other matters currently while this case has been going on. There was a matter that I represented him in having to do at the very inception, I believe it was way back in December or November, having to do with a domestic relations matter, child support.

THE COURT: Nothing to do with any of the matters involved in this case?

MR. ZITKO: No. At one time, I represented him not in Court, but simply as Columbus counsel in the FTC matter, you see, but not as counsel of record.

Boling informed the court at this juncture that she was unable to communicate with Zitko, and stated:

I have been threatened. I have been talked to like a dog. I cannot converse with Mr. Zitko without profanity. I cannot work with this man.... I do not believe I'm being properly defended. I know that it would be inconvenient to the Court, but at this point, I would much rather take my chances with someone from day one than to go on with the relationship here.

The court declined Boling's request, responding that Mr. Zitko was an experienced attorney, that Boling should trust Mr. Zit-

---

**5.** The FTC case was a civil case filed in North Carolina. Boling was not a party to the FTC case. The FTC conducted a very extensive investigation of Lauback and DuraSeal and never considered Boling to be a responsible party concerning its complaints which were related to the indictment charges.

ko's judgment with regard to "strategy in evidence matters," and that a new lawyer would be unable to represent her adequately due to the magnitude of the case. She claimed that she was unable to employ private counsel due to her poor financial condition.

During the in-chambers meeting, Boling also complained that the government had not turned over exculpatory files she had given to the nearest federal agent, a Secret Service agent, who forwarded the records to the United States Attorney during the grand jury investigation. Boling was particularly concerned about the "Tilson file," a folder containing information on a potential arrangement she had been negotiating for DuraSeal with K–Mart. The attorney for the government responded that all of the voluminous documents had been made available to the defendants. The court suggested that the attorneys for the parties meet to try to locate the allegedly missing documents. The documents and files in question were located in the possession of the government.

The jury convicted Lauback on every count submitted to it and convicted Boling on the conspiracy count, five counts of mail fraud, and three counts of wire fraud, acquitting her on thirteen counts of mail and wire fraud. (The trial court had earlier acquitted Boling and Lauback on six such counts.)

Approximately five weeks after trial, Boling wrote a letter to the court requesting new, appointed counsel and a new trial. The court thereupon appointed new counsel, who filed a motion for a writ of error *coram nobis* or, in the alternative, for a new trial, based on Zitko's alleged conflict of interest, ineffective assistance of counsel, and the failure to accord Boling her right to counsel of choice. A hearing was held on this motion. Both Zitko and Boling testified at this hearing, and Boling submitted the testimony of several witnesses she considered to be important and that she had requested Zitko to call on her behalf during trial. The court held (1) that the motion for new trial was not timely, (2) that Boling's claim of conflict of interest

was not sufficient to justify the issuance of a writ *coram nobis,* and (3) that Boling had not established her claim.

Thereafter, Lauback was sentenced to one year of imprisonment on counts 1, 2, and 5, to run consecutively, placed on a period of probation, and fined. Boling was sentenced to five years probation and 500 hours of community service. Both defendants appeal their convictions.

## I. FAIR TRIAL/CONFLICT OF INTEREST

Both Boling and Zitko testified at the hearing on her motion for a new trial, and Boling presented much of the evidence she had requested Zitko to introduce at trial.

Zitko testified that he "really didn't have to tell [Boling] too much [about his prior representation of Lauback] because that's why she called me." He claimed that Boling knew he was involved in the DuraSeal FTC investigation, and that he discussed with her a potential conflict of interest. He indicated further that

> I told her I was trying to settle the FTC matter for Lauback, but would not represent Lauback in the FTC case in North Carolina, and had told him to get counsel to represent him in the FTC case in North Carolina, ... which he did.

When asked by the trial judge whether he represented Lauback at the outset of the FTC cases, Zitko replied:

> No, not really, I don't think so. I don't know how many—or who else Lauback may have had advising him. He finally came to us and I agreed to make some phone calls to the FTC in Washington for him and for DuraSeal, which I did.
>
> Then, as I recall ... the lawsuit was filed in North Carolina by the FTC and of course I told him I could not represent him as counsel in that case....

Zitko decided that the government could not prove that Boling had an intent to defraud, and based his trial strategy on this decision. He initially thought he could defend Boling by arguing that she was simply an employee who did not know what was going on, but he apparently rejected

that strategy. Zitko acknowledged that Boling never indicated in writing that she waived any conflict of interest on his part.[6]

With regard to the witnesses Boling had requested Zitko to call on her behalf, Zitko stated that Lauback's former executive secretary, Daryl Gannon, was not credible because she had changed her story; that Beth Fout, a DuraSeal office worker, was "dangerous"; and that attorney Arnold Cohen, a specialist in franchise law, might give the impression that Boling "was in a decisionmaking power slot at DuraSeal."

Boling's testimony supported the statements she made during the in-chambers trial conference. She added that Lauback owed her approximately $15,000 in commissions, and that if she ever received the money, she would use it to pay Zitko. She stated that she discovered Zitko's conflicting representation of Lauback in the FTC companion case for the first time while reviewing discovery documents during the course of the trial. When she confronted Zitko about this, he allegedly denied active involvement in the FTC case. She also claimed that Zitko conferred frequently with Lauback and "seemed to be more on Andy's side."

Vincent Amberly, an FTC staff attorney, testified at the hearing that Zitko clearly represented Lauback in the FTC case. He also stated that the FTC did not make Boling a defendant in its case because it did not feel that she was a principal in the DuraSeal business. He arranged depositions of important witnesses with Zitko, whom he considered to be Lauback's counsel.

Fout, who worked in DuraSeal's Columbus office, submitted an affidavit stating that Lauback was in control of operations, and that "nothing was ever done without Lauback's approval or knowledge." She stated that most of the "facts" set forth in the DuraSeal brochure "were false or could not be substantiated," and that Lauback's purpose in using it was "to make sure all employees told customers the same story."

She averred that Lauback "instructed DuraSeal sales representatives to represent that DuraSeal would become a nationally franchised dealer program within the next 30 or 60 days." Fout's FTC deposition also indicated that Lauback used company funds for a variety of personal and family purposes.

In a later affidavit, Fout stated that she never saw Boling in the Columbus office, confirmed that Lauback owed Boling considerable money, and insisted that

> [w]henever Ms. Boling found out about problems encountered by persons to whom she had sold dealerships ... she would pursue the problem with Mr. Lauback, or with Daryl [Gannon] or me, in an effort to make good on the dealership package.

Fout indicated that Lauback told her not to tell Boling about lawsuits against the business, and "[a]ccordingly we did not tell Ms. Boling about them." Finally, Fout expressed her shock about Boling's indictment because Boling "was not in the office and, therefore, would have been largely unaware of substantial information about complaints and the business' inability to make timely deliveries to the dealers." She testified that Zitko represented Lauback at an FTC deposition taken of her, and did not discuss with her giving testimony for Boling at the criminal trial.

Gannon, Lauback's executive secretary from August 1981 until July 1984, corroborated Fout's statements. She also asserted that when she informed Lauback of dealer complaints, "he expressly told me to lie [to] the callers and to fabricate excuses." She stated further:

> Mr. Lauback's standing office policy was to *not* inform Ms. Boling about [dealer] complaints—and he told me *not* to tell her, and I did not tell her about his policy until after I heard of her conviction.

(Emphasis in original.) She noted that when Boling did find out about a dealer problem, Boling would "go to bat" for that dealer. When Boling called Lauback about

---

6. *Zitko stated to the court that he represented Boling* at the FTC deposition of Gannon. He was listed as the counsel for Lauback.

a problem, he apparently would make excuses and tell her that he was going to solve the problem. Gannon said that Boling did not know the severity of the DuraSeal's cash flow problems, and that Lauback did not tell Boling about these problems so that she could "concentrate" on selling dealerships.[7] Zitko never contacted her about being a witness for Boling.

Arnold Cohen, the attorney handling the DuraSeal franchise application, stated at the hearing that Boling called him half a dozen times to ask when DuraSeal would be franchised. He said that, at trial, he "was going to testify to my knowledge of Miss Boling's activities so far as I was concerned, that I never had any policymaking discussions with her. I never had anything to do with her except when she would call from time to time and ask me, 'When is this going to happen?'" He did indicate that he informed Boling that work was stalled because Lauback had not paid him. Like Fout and Gannon, he indicated that he was prepared to testify for Boling at trial, but was never called, and that Zitko had not discussed the substance of his possible testimony for Boling.

The trial judge indicated that Boling's claims of conflict of interest and ineffective assistance of counsel were not supported by evidence sufficient to merit *coram nobis* relief. He added, assuming "that this ground is sufficient to justify the issuance of a writ of error *coram nobis,* the Court does not find that defendant has established this claim." He found Zitko's involvement in the FTC case to be minimal and that no actual conflict of interest existed.

In *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984), the Supreme Court set forth the standard for analyzing conflict of interest cases:

In *Cuyler* ... [we] held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty

of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts ... it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the *per se* rule of presumed prejudice that exists for the Sixth Amendment claims mentioned above [actual or constructive denial of the assistance of counsel altogether]. *Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."*

(Emphasis added) (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 345–50, 100 S.Ct. 1708, 1716–19, 64 L.Ed.2d 333 (1980)); *see also Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).[8]

We consider in this type of case: (1) whether there is an actual conflict of interest and (2) whether that conflict has caused ineffective performance in violation of the Sixth Amendment. *Thomas v. Foltz,* 818 F.2d 476, 480 (6th Cir.1987). With regard to the "actual conflict" prong:

We will not find an actual conflict unless appellants can point to "specific instances in the record to suggest an actual conflict or impairment of their interests." ... Appellants must make a factual showing of inconsistent interests and must demonstrate that the attorney "made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other. If he did not make such a choice, the conflict remained hypothetical." ... There

---

7. In addition to their depositions and affidavits, both Fout and Gannon testified and were cross-examined at the *coram nobis* hearing.

8. *Burger* may be distinguished from the case at bar because the *Burger* defendants received separate trials.

is no violation where the conflict is "irrelevant or merely hypothetical" there must be an "actual significant conflict." *Thomas,* 818 F.2d at 481 (quoting *United States v. Mers,* 701 F.2d 1321, 1328 (11th Cir.), *cert. denied,* 464 U.S. 991, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983)).

■ On careful consideration, we find in this record ample evidence to meet this first prong of conflict of interest. Zitko refused, without any adequate explanation, to call several witnesses whose testimony would have bolstered strongly the argument that Boling was merely an employee unaware of the full extent of Lauback's activities. These witnesses would have been adverse to Lauback. Had Fout, Gannon, Amberly, and Cohen been called to testify, the jury may well have acquitted Boling of some or all of the remaining counts on which she had been found guilty. In addition, Zitko failed, without explanation, to cross-examine Lauback when he took the stand at trial. While this tactic may have been part of a "common defense" strategy, it unquestionably was very harmful to Boling.

In sum, we are satisfied that the testimony of the witnesses Zitko failed to call, without adequate excuse or justification, may well have made a difference in the outcome of the case with regard to Boling. We conclude as a matter of law that there was a conflict of interest on Zitko's part due to specific proof of an "actual significant" divergence of his past active representation of Lauback from his duty to represent Boling regardless of harm to Lauback's position. Zitko apparently allowed the interests of Lauback's attorney, who apparently was his former law office associate, to predominate during trial.

We are also satisfied that Boling received inadequate representation of counsel by his inexplicable failure at trial to call witnesses favorable to her and to emphasize her role as a sales commission agent under the control and supervision of Lauback, who was deceiving her about the realistic prospects of DuraSeal to survive financially and to initiate a successful franchise operation. It was therefore error for the district court not to grant Boling a new trial. Accordingly, we vacate the convictions against Boling and order the district court to conduct a new trial, as to Boling, on the remaining substantive counts.

## II. SUFFICIENCY OF EVIDENCE

Both defendants claimed that their convictions were not supported by substantial evidence both as to the conspiracy and the substantive mail and wire fraud counts. The standard of review for claims of insufficient evidence is "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

The government presented over fifty witnesses and hundreds of documents to prove fraud through the use of the mail and wire. Viewing this evidence, excluding that evidence presented at the *coram nobis* hearing, in a light most favorable to the government, we find that the jury could have found the essential elements of mail and wire fraud beyond a reasonable doubt on all counts against both Lauback and Boling.

■ On appeal, Boling challenged the sufficiency of evidence presented against her on counts 24 and 25. Count 24 relates to representations which were made by sales representative Gordon Reel to dealer Ron Elton and ratified and adopted by defendant Lauback. Count 25 relates to misrepresentations made by Reel and defendant Lauback to dealer James Driscoll. Dealers Elton and Driscoll testified that they did not even know Boling, much less have contact with her. Notwithstanding, defendant Boling's convictions on these counts must be upheld under the Pinkerton Doctrine, *Pinkerton v. United States,* 328 U.S. 640, 646, 647, 66 S.Ct. 1180, 1184 (1946), which was followed by this court in *United States v. Davis,* 809 F.2d 1194, 1203 (6th Cir.1987), and *United States v. Gallo,* 763 F.2d 1504, 1519 (6th Cir.1985). Because the jury was satisfied beyond a

reasonable doubt that Boling was a co-conspirator during the time involved, these acts by co-conspirator Lauback in furtherance of the conspiracy are "attributable to [Boling] for the purpose of holding [Boling] responsible for the substantive offense[s]." *Pinkerton,* 328 U.S. at 647, 66 S.Ct. at 1184.

According to 18 U.S.C. § 371, the conspiracy statute under which Lauback and Boling were convicted, "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, ... and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both." Viewing the evidence in a light most favorable to the prosecution, we find that the jury could have found that Lauback and Boling violated the federal conspiracy statute. However, because Boling's attorney was burdened by an active conflict of interest, we reverse her conviction on the conspiracy count and remand for a new trial.

■ The law requires that it takes at least two persons to commit a conspiracy. *See United States v. Sandy,* 605 F.2d 210, 215 (6th Cir.), *cert. denied,* 444 U.S. 984, 100 S.Ct. 490, 62 L.Ed.2d 412 (1979). Lauback and Boling are the only indicted co-conspirators in the case. The government identified two unindicted co-conspirators, but the evidence does not support the charge that either of the unindicted co-conspirators conspired with either defendant Lauback or defendant Boling. Nor does the evidence prove that any person, other than defendant Lauback and defendant Boling, was a member of the conspiracy charged in count 1. Under these circumstances we must also reverse Lauback's conspiracy conviction and remand for a new trial, even though this may well be a "windfall for him." Should either Lauback or Boling be found not guilty of conspiracy, we hold that the conviction of the other may not be upheld. *See United States v. Lester,* 363 F.2d 68, 72 (6th Cir.1966), *cert. denied,* 385 U.S. 1002, 87 S.Ct. 705, 17 L.Ed.2d 542 (1967); *see also United States*

*v. Hopkins,* 716 F.2d 739 (10th Cir.1982) (holding that acquittal of co-defendant required acquittal of defendant when only defendant and co-defendant were indicted for conspiracy and there was no evidence implicating anyone else as a co-conspirator).

### III. CO–CONSPIRATOR STATEMENTS

■ Both defendants complain that the trial court erred by admitting into evidence statements of an alleged co-conspirator before the conspiracy itself was established. During the trial, Lauback's and Boling's trial counsel each objected to the hearsay statements of all other salespersons and of the other co-defendant. At the start of the testimony, the trial judge stated that these statements would be admitted conditionally subject to later proof by a preponderance of the evidence that the statements were admissible as those of a co-conspirator. At the close of the government's case-in-chief, the trial court ruled that a preponderance of the evidence showed (1) the existence of a conspiracy, (2) that Boling was a member of the conspiracy, and (3) that the out-of-court declarations were made during the course and in furtherance of the conspiracy. The procedure employed by the trial judge was approved by the Sixth Circuit in *United States v. Vinson,* 606 F.2d 149, 153 (6th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980).

The judge may ... admit the hearsay statements subject to later demonstration of their admissibility by a preponderance of the evidence. If this practice is followed, the court should stress to counsel that the statements are admitted subject to defendant's continuing objection and that the prosecution will be required to show by a preponderance of the evidence that a conspiracy existed, that the defendant against whom the statements are hearsay was a participant and that the statement was made in the course and in furtherance thereof. At the conclusion of the government's case-in-chief, the court should rule on the defendant's hearsay objection. If the court finds that the government has met the burden

of proof described in [*U.S. v.*] *Enright*, [579 F.2d 980 (6th Cir.1978),] it should overrule the objection and let all the evidence, hearsay included, go to the jury, subject, of course, to instructions regarding the government's ultimate burden of proof beyond a reasonable doubt and the weight and credibility to be given to co-conspirators' statements.

*Vinson*, 606 F.2d at 153.

■ Because the district court complied with *Vinson* and *Enright*, we hold that no error was committed by allowing the statements into evidence. The evidence was also admissible as to statements made by Boling because they were made, at the very least, in the course of employment under direction and control of Lauback.

With regard to Lauback, then, the admission of the statements on the substantive counts was not unduly prejudicial because they were also admissible under Federal Rule of Evidence 801(d)(2)(D) as "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."

## IV. DISCOVERY AND BRADY MATERIAL

■ Both defendants allege that the government initially failed to furnish certain exculpatory and impeachment evidence allegedly in its possession. After an evidentiary hearing, the trial judge concluded that the government established by a preponderance of the evidence that the documents in question (referred to as the Boling documents or the Tilson file) were not *Brady* material because the documents were known to the defense. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *see also United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) ("The rule of *Brady* ... arguably applies in three quite different situations. Each involves the discovery, after trial, of information which had been known to the prosecution but unknown to the defense.")

The record indicates:

Lauback ... participated in the discovery process and copying of discovery documents in late December 1986. He stated that he knew defendant Boling was a co-defendant and that her documents had been subpoenaed. He stated that while reviewing the discovery documents he was specifically looking for the photographs and the Tilson file, but he was unable to locate them. Defendant Boling testified that she gave the Boling documents to the Secret Service pursuant to a grand jury subpoena and that she retained an inventory of items she produced. She stated that in March of 1986 she reviewed copies of numerous documents, the copies having been made by defense counsel of documents produced for discovery, and she realized that copies of the Boling documents were not there.

These circumstances do not bring this case within the *Brady* rule.

The district court made a finding that the government established by a preponderance of the evidence that the Boling documents were made available to the defendants during pretrial discovery. The district court also held that even if the Boling documents were not made available to the defendants, the defendants' right to due process under *Brady* was not violated.

First, the Court does not find these documents to be exculpatory. The indictment alleges that defendants made false representations as to the existence of national contracts. Contrary to the claim in the defendants' brief that the Tilson file "contained material pertinent to negotiations with a national account, to wit: K–Mart, through its representative Ted Tilson," the Tilson file contains only evidence of proposals by different DuraSeal dealers for sealing contracts on individual K–Mart lots at different locations at different times. It does not contain any evidence of negotiations by DuraSeal's corporate offices for national contracts. Second, the Court does not find these documents to have any significant impeachment value. The Tilson file shows that certain dealers, including John Platcher, Wade Avinger, Rick Shriver, and Sue Morgan (all of whom have already testified), submitted individual bids on particular K–Mart lots. The doc-

uments in the Tilson file are not inconsistent with these witnesses' testimony, all of whom testified they made bids on commercial lots. Indeed, Mr. Shriver testified that he measured two K–Mart lots at defendant Boling's request but that he never got the contracts to do those jobs. Additionally, photographs showing various of the witnesses at training seminars is not inconsistent with the witnesses' testimony, many of whom have testified that they did, in fact, attend training seminars.

Finally, the court held that even if it were to assume that the Boling documents had not been made available to the defendants before trial and that they contained exculpatory or impeachment evidence, the violation still would not meet the standard of materiality required by *United States v. Bagley*, 473 U.S. 667, 678–83, 105 S.Ct. 3375, 3381–84, 87 L.Ed.2d 481 (1985). *See also United States v. O'Dell*, 805 F.2d 637, 641 (6th Cir.1986) (holding that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"). Because we believe that the rationale of the district court is sound, we uphold its decision of this issue. As an alternative basis for upholding the decision of the district court, we believe that even if the government initially failed to disclose the documents, the defendants were not prejudiced because disclosure was made in time for the defendants to use the documents to cross-examine the great majority of government witnesses. *See United States v. Blanco*, 844 F.2d 344 (6th Cir.1988) (indicating that even if the report were exculpatory, there was no violation of *Brady* because the defense counsel received the document during trial in time to use it for cross-examination).

## V. SUMMARY

Because Boling's attorney labored under an active conflict of interest and failed to call witnesses favorable to his client, we REVERSE Boling's convictions on the conspiracy and substantive counts and REMAND to the district court for a new trial on these matters. Because Lauback and Boling were the only alleged conspirators, we REVERSE Lauback's conspiracy conviction and REMAND for a new trial on this issue. All of the substantive counts against Lauback are AFFIRMED.

WELLFORD, Circuit Judge, dissenting in part:

I believe that the evidence presented by the United States at trial is insufficient to support Boling's convictions on counts 24 and 25 of the indictment. Count 24 concerns a letter from Ron Elton, a dealer in Shenandoah, Pennsylvania. Count 25 involves a letter addressed to James Driscoll, a dealer in Hudson, Massachusetts. During trial, Elton and Driscoll both testified that they dealt with Lauback and Gordon Reed, another DuraSeal salesperson, and that they did not even know Boling, much less have contact with her. Neither letter, which was the basis of these charges, was addressed to or written by Boling, and both letters were directed to or from Columbus, Ohio, not Wilmington, North Carolina. Boling's convictions on counts 24 and 25 should be accordingly reversed and set aside.

I concur in the majority opinion with respect to all other issues discussed therein.