**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Juan Andres BLANCO (86–6305), Jorge Luis Fresneda (86–6306), Rafael Oscar Spinola (86–6307), Defendants–Appellants.**

**Nos. 86–6305, 86–6306 and 86–6307.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 22, 1987.

Decided April 14, 1988.

Rehearing Denied in Nos. 86–6306 and 86–6307 May 18, 1988.
Certiorari Denied June 6, 1988.
See 108 S.Ct. 2042.

---

Edward G. Drennan (argued), court-appointed, Florence, Ky., for Blanco.

Louis DeFalaise, U.S. Atty., James Zerhusen (argued), Lexington, Ky., for the U.S.

Michael W. Burnbaum (argued), Coral Gables, Fla., for Spinola.

Wilbur M. Zevely (argued), Florence, Ky., for Fresneda.

Before GUY, NELSON, and BOGGS, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

Defendants Juan Andres Blanco, Jorge Luis Fresneda and Rafael Oscar Spinola were convicted on federal charges relating to the possession of cocaine. Defendants Fresneda and Spinola contend on appeal that their convictions were tainted by the introduction in evidence of some six pounds of cocaine that they say was obtained through an unreasonable search and seizure. Defendant Spinola also contends, as does defendant Blanco, that the evidence against him was legally insufficient; Spinola alone contends that the government violated a duty to provide him exculpatory information and that the district court erred in refusing to sever his trial from defendant Fresneda's. Finding that there was no unlawful search or seizure and that none of the other contentions is meritorious, we shall affirm the convictions.

## I

Shortly before 7:00 p.m. on Thursday, May 8, 1986, as the record indicates, defendant Spinola, accompanied by defendant Fresneda, rented a Hertz car at the Miami International Airport. The rental agreement, which listed Jorge Luis Fresneda as an additional authorized driver, provided for the car to be returned at the Miami airport on May 12, 1986.

After leaving the airport, Fresneda dropped Spinola off at the latter's house in Miami and picked up defendant Blanco.

Fresneda and Blanco then drove nonstop to the Greater Cincinnati Airport—a distance of over 1,000 miles.

The two men checked into room 114 at the Americana Inn, on the airport grounds, at about 4:00 o'clock Friday afternoon, May 9, 1986. They had no reservations. They paid for the room, in advance, with cash. After carrying their luggage to their room, they moved their car from a parking spot in front of the hotel to one in back, where it could be seen from their window. They also placed an operator-assisted telephone call to Miami. The hotel desk clerk was suspicious of the Latin–Americans from Florida, and shared his suspicions with the local police; they called federal drug enforcement officials.

Special Agent William Modesitt of the United States Justice Department's Drug Enforcement Agency went to the hotel at about 6:00 p.m., accompanied by a Cincinnati Airport police officer. After interviewing the desk clerk and inspecting Mr. Fresneda's hotel registration records, Agent Modesitt had a look at the visitors as they were eating supper in the hotel's restaurant. He testified later that they were not wearing business suits, and he said that their mannerisms and dress were such that the men "did not look like they belonged at that hotel." He also had a look at their automobile, noting its Dade County license plate and a Hertz sticker. Agent Modesitt then made a series of telephone calls to learn what he could about Mr. Fresneda and his car. Nothing was turned up on Mr. Fresneda, but shortly before 8:00 p.m. the agent was told that a person named Rafael Spinola had rented the car in Miami only the day before.

Based on his extensive experience with narcotics cases, Agent Modesitt thought that the likeliest explanation for the presence at the airport hotel of the two hard-driving motorists from Miami was that they were drug couriers. The Greater Cincinnati Airport, situated in Erlanger, Kentucky, is, as the trial court observed, "located in the middle of nowhere from a standpoint of vehicular traffic and non-airplane traffic related guests." Aware that

the Miamians' car had been rented only the day before in a distant city known to be a "source city" for narcotics (see *United States v. Knox*, 839 F.2d 285 (6th Cir. 1988)), Agent Modesitt did not have to be Sherlock Holmes to realize, as Agent Modesitt testified he did realize, that "for two individuals [who looked out of place] to show up at the Americana Hotel in the middle of nowhere in Kentucky, [in] a rented car from Florida ... less than 24 hours from Miami ... fits a pattern by narcotic couriers who drive [drug] loads through." The agent decided to "approach the individuals in Room 114 and inquire of them what was going on...."

Accompanied by another DEA agent and three local law enforcement officers, Agent Modesitt went to the hotel room shortly after 9:15 p.m. A policeman knocked on the door. Defendant Blanco asked who was there. He was told it was the police and they wanted to ask some questions. Mr. Blanco opened the door, and the officers entered the room (which was lit only dimly) with handguns at the ready.

Someone turned up the lights. Finding their reception less hostile than they had feared, the officers (joined now by another DEA agent) put their weapons away and explained that they were looking into drug trafficking. Fresneda and Blanco denied knowing anything about that.

Agent Modesitt asked the men for identification, and they produced their driver's licenses. Modesitt then inquired what had brought them to Cincinnati, and whether they were visiting friends or relatives there. Mr. Fresneda replied that they were not visiting anyone and had driven up from Florida for a short "vacation." In re-

sponse to a question as to what they planned to do in Cincinnati, Mr. Blanco told a white lie, as it were; he said they were going to see a Cincinnati Reds baseball game.

That proved to be a tactical error. The Cincinnati Reds were playing in New York that evening, and they were scheduled to play next in Montreal. The officers, unlike Mr. Blanco, knew the schedule.

"Bothered," as he put it, by the proposition that two gentlemen who had driven from Miami to Cincinnati to take in a baseball game should not have known that the team was going to be out of town, and "bothered" also by the fact that the two should have left Interstate 75 (the highway leading into Cincinnati) in order to take a single room in an out-of-the-way airport hotel more expensive than the motels along Interstate 75, Agent Modesitt asked the men if they would consent to a search of the room and car. The agent advised them, he testified, of their Fourth Amendment right to refuse consent. He also let them know that he would try to secure a search warrant if they did refuse.

Taking, perhaps, a calculated gamble, Mr. Fresneda indicated that he would consent to the search. "No problem," he told Agent Modesitt. The agent then produced a consent form utilized by the Drug Enforcement Agency, read the entire document aloud to Mr. Fresneda, and asked him if he understood everything in it. Mr. Fresneda said he did, and proceeded to sign and date the consent form. The DEA agents then signed the form as witnesses, and Agent Modesitt made a notation of the time: 9:34 p.m.[1]

1.  The text of the form, as completed by the DEA agents while it was being read aloud, is as follows:

    "CONSENT TO SEARCH
    "I, Jorge Fresneda having been informed of my constitutional rights: first, that I may require that a search warrant be obtained prior to any search being made; second, that I may refuse to consent to any search; third, that anything which may be found as a result of this search which is subject to seizure can and will be seized and used against me in a criminal prosecution; fourth, that I may consult

    with anyone of my choosing before I make a decision to waive my rights by consenting to this search, I hereby authorize S/A Bill Modesitt, and S/A Jim Lupo and Agent Dave Bass (agents of the Drug Enforcement Administration, United States Department of Justice), to conduct a complete search of the premises and vehicle under my control described as Rm # 114, Americana Hotel, Boone Co., Ky & 1986 Olds 98, White in Color, 478 ZTZ, Fla. This written permission is given by me voluntarily and without threats or promises of any kind being made to me."

The ensuing search of the hotel room produced nothing of interest. Aside from a copy of the rental agreement, neither did the initial search of the car.[2] A dog was brought to the car to sniff for drugs, but the dog's reactions were inconclusive. Agent Modesitt, who had 17 years of drug enforcement experience, still thought that the logic of the situation pointed to the presence of drugs somewhere in the car; accordingly, like their *French Connection* counterparts, Modesitt and his associates proceeded, as Modesitt put it, "to pull the car apart."

Upon removing the interior panels of the rear doors of the car, the agents found, concealed inside the doors, three wedge-shaped packages wrapped in tape. Inside the packages was a little under three kilograms of cocaine. It was worth approximately $300,000.00. Messrs. Fresneda and Blanco—who subsequently indicated to Agent Modesitt that "they didn't know anything about it, they were as surprised as I was"[3]—were placed under arrest.

Forty-five minutes after the arrest of Fresneda and Blanco, Mr. Spinola—the man in whose name the car had been rented in Miami—checked into the hotel. After going to his room, he placed a telephone call to Oxford, Ohio. The number he called was the same number to which a call had been placed earlier from the room occupied by Messrs. Fresneda and Blanco. Mr. Spinola was arrested too.

Prior to Mr. Spinola's arrival, the hotel had received a number of calls from Oxford; the caller, who identified himself as "Tom," asked for Mr. Spinola, who was not yet registered in the hotel and had no reservation. The next day there were two phone calls, one from Tom, to Mr. Spinola's hotel room. When the DEA agent who took Tom's call tried to ascertain whether he was trying to buy narcotics, the caller stated that he did not have any "business" with Mr. Spinola. The same agent subsequently took a second call for Mr. Spinola, and again attempted to ascertain the reason for the call. This time the caller abruptly hung up. The agent later described his conversations with the two callers in a report that was given to the defense at the time of trial.

## II

Two evidentiary hearings—one before a magistrate and one before the district judge—were held prior to trial on motions by the defendants for suppression of "all evidence obtained in the case"—*i.e.*, the cocaine. The magistrate concluded that there had been an unreasonable seizure of Messrs. Fresneda and Blanco at the time the officers entered their hotel room, so Mr. Fresneda's subsequent consent to the search was invalid; the magistrate recommended granting the motion to suppress.

The district court initially agreed with the recommendation, but did not totally accept the magistrate's reasoning. The court found that Agent Modesitt "had ... a particularized and objective basis for his belief that [Fresneda and Blanco] ... were engaged in, or about to engage in, illegal narcotics trafficking," and that this justified the agent's going to the hotel room to question the occupants. The court nonetheless concluded that (1) because the intrusion into the defendants' hotel room by half a dozen armed law enforcement officials lasted at least ten minutes before the consent to search was given, (2) because some 55 minutes elapsed between the time the consent was given and the discovery of the cocaine and the formal arrests, and (3) because Messrs. Blanco and Fresneda were

---

2. The car was locked, and Mr. Fresneda, who went out to the car with Agent Modesitt, produced a key with which Modesitt unlocked the car doors. Mr. Blanco remained in the hotel room while the car was being searched. As Agent Modesitt and Mr. Fresneda were preparing to leave the hotel room for the search of the car, Mr. Blanco said something to the effect that "If there are any drugs in that car I know nothing about it."

3. The extent of Agent Modesitt's "surprise" has already been indicated. Mr. Fresneda's surprise may be measured by a remark he was overheard making to defendant Spinola after both men had been arrested: "What a pisser, I knew I should have driven the stuff up in my own truck."

not free to leave during either of these periods, there was an investigative detention that was "excessive" in its "scope and nature." The motion to suppress the cocaine was granted on that basis.

The government moved for reconsideration of the suppression order on the grounds that the defendants lacked standing to raise the Fourth Amendment issues on which the order had been based. The district court granted the motion for reconsideration and vacated the suppression order. Mr. Spinola, who rented the car, was held to have exhibited no expectation of privacy in the car after he turned the vehicle over to Mr. Fresneda. Mr. Blanco was held to have exhibited no expectation of privacy because he had merely accompanied Mr. Fresneda as a passenger in the rented car. The court held that although Mr. Fresneda, unlike the others, had exhibited a subjective expectation of privacy, he had no standing either, under *United States v. Bailey*, 628 F.2d 938 (6th Cir. 1980), because "society is not prepared to recognize that expectation of privacy as to the interior of the door of a rented automobile."

The case went to trial before a jury of twelve. The government was permitted to introduce evidence of the discovery of the cocaine. Messrs. Fresneda and Spinola were found guilty on three counts and Mr. Blanco on two. All the defendants have appealed, defendants Fresneda and Spinola both challenging the constitutionality of the search for and seizure of the cocaine. We shall first address the question of their standing to raise that issue.

### III

The district court asked the right questions, as the case law teaches; the court had to determine first whether each de-fendant had a subjective expectation of privacy in the automobile, and, if so, whether such expectation was of a sort that society is prepared to protect. See *California v. Ciraolo*, 476 U.S. 207, 210, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210, 215 (1986), and *United ed States v. Trickey*, 711 F.2d 56, 59 (6th Cir.1983).

■ We cannot say that the district court erred in concluding that Mr. Spinola had no subjective expectation of privacy in the rented car. In a somewhat similar context, the Court of Appeals for the First Circuit affirmed a decision refusing to suppress evidence acquired in a search of an apartment that the defendant had rented but did not occupy or use. *United States v. Gomez*, 770 F.2d 251, 254–55 (1st Cir.1985). Here, Mr. Spinola did not keep possession of the car. He gave his only set of keys to Mr. Fresneda. He had no access to the car thereafter, and he could not exclude others from the vehicle. Mr. Spinola had the burden of proof on the issue of standing, and the resolution of that issue against him was not clearly erroneous.[4]

■ As to Mr. Fresneda, the district court was clearly correct in holding that he had a subjective expectation of privacy in the locked car for which he had the keys and on which he was able to keep a watchful eye from his hotel room. We think the district court was incorrect, however, in holding that society is not prepared to recognize a bailee's expectation of privacy in the door panels of a rented automobile. Implicit in the district court's determination on this point is the idea that if Mr. Fresneda had stored the cocaine in the glove compartment or under a seat, he would have had standing to object to its seizure. We do not understand why society should be thought less willing to protect an expec-

---

4. Mr. Spinola contends that the district court erred in allowing the government to withdraw from a "stipulation" that he had standing. There is no evidence that Spinola and the government had ever so stipulated. Although the government did state during the hearing before the magistrate that it was satisfied that Spinola had standing, we see no prejudice to Spinola from the government's reversal of its position. The change of position was damaging in that it led to Mr. Spinola's conviction, but it was not prejudicial in the sense that he had relied on the government's original position to his detriment. It is doubtful, indeed, whether the government has any power to "stipulate" as to standing; questions of law are not generally subject to stipulation. *United States v. Miller*, 822 F.2d 828, 831–32 (9th Cir.1987).

tation of privacy in a good hiding place than in a poor one.

Suppose Mr. Fresneda had been a little old lady from Cincinnati, driving a rental car to Miami with her life savings in cash. If such a person felt nervous about keeping the money in the glove compartment or under a seat, can we say that society would not be prepared to recognize her expectation of privacy if she chose to hide it in a door panel? We think not—and we think Mr. Fresneda had standing to litigate the constitutionality of the search for and seizure of the cocaine. (We need not discuss Mr. Blanco's situation, because he does not press any Fourth Amendment issue here.)

■ The trial court expressly found that Mr. Fresneda consented to the search knowingly and voluntarily. If such a consent is itself the fruit of a Fourth Amendment violation, however, the consent, under the controlling case law, is deemed a nullity. *Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983); *Dunaway v. New York*, 442 U.S. 200, 204, 99 S.Ct. 2248, 2252, 60 L.Ed.2d 824 (1979); see *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Consent to a search is ineffective if given immediately after a government agent has seized the consenting party's person in violation of the Fourth Amendment. *Royer*, 460 U.S. at 501, 103 S.Ct. at 1326. The question thus presented is whether Mr. Fresneda was seized unreasonably, in violation of the Fourth Amendment, before he consented to the search of the rental car. We do not think he was. See *United States v. Knox*, 839 F.2d 285 (6th Cir.1988).

At least since *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court has recognized that law enforcement officers may stop for questioning a person who is reasonably suspected of participation in ongoing criminal activity. 392 U.S. at 22–23, 88 S.Ct. at 1880–81. Weighing the government's "general interest [in] ... effective crime prevention and detection" against the individual's interest in being free of restraint, the *Terry* court thought that the officers' right to stop an individual hardly merited discussion; the "crux" of the case, the Court thought, was "whether there was justification for ... searching [the suspect] in the course of that investigation." *Id.* See also *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

It seems to us, as it seemed to the district court, that considering the totality of the circumstances in the case at bar, Agent Modesitt had reasonable grounds for suspecting that Messrs. Fresneda and Blanco were trafficking in narcotics. Certainly the officer had no difficulty in articulating the basis for his suspicions. Like the suspects in *United States v. Knox, supra,* the defendants were traveling from Miami, a well-known source of drugs. They had driven more than 1,000 miles in a car that had been rented in Miami only one day before and was scheduled to be returned there only three days hence, just after the weekend. The men had driven to a not inexpensive airport hotel frequented primarily by businesspeople, and had paid for a single room in cash. They did not seem to be air travelers or conventional businessmen. The hotel's location was such that it was not normally patronized by people who had no occasion to be at the airport. Agent Modesitt—who had almost two decades of experience in drug law enforcement—was well aware that huge quantities of illegal drugs come from Latin America to Florida, whence such drugs are carried to other parts of the country by couriers. The couriers favor weekend travel, as Agent Modesitt testified. They often meet their contact people at or near airports, and their travel tends not to be leisurely. Agent Modesitt could doubtless have hypothesized countless innocent explanations for Mr. Fresneda and his companion having driven so fast from Miami to an airport hotel in the wilds of greater Cincinnati, but it was hardly unreasonable for the officer to conclude, as he did conclude, that the likeliest explanation was the one the jury ultimately found to be correct: the men were drug couriers. Agent Modesitt's decision to have a word with the men in room 114 was eminently sensible.

The manner in which Agent Modesitt chose to approach the suspects cannot seem unreasonable to anyone who reads the daily newspapers. The agent knocked

politely on the door of the motel room and told the occupants who he was and what he wanted. There was no evidence of any loud or abusive language or any unnecessary brandishing of firearms. It is true that the officers drew their weapons before entering the room, but that precaution was not unreasonable. Perhaps there will be readers of this opinion who would have felt perfectly comfortable about identifying themselves as police officers and then walking unprotected into a dimly lit motel room believed to be occupied by drug couriers, but we do not count ourselves among their number.

The subsequent detention and questioning of Messrs. Fresneda and Blanco did not violate the Fourth Amendment, in our opinion. See *United States v. Knox, supra,* and *United States v. Renfro,* 620 F.2d 569, 574–75 (6th Cir.), *cert. denied,* 449 U.S. 902, 101 S.Ct. 274, 66 L.Ed.2d 133 (1980). Just as when law enforcement officers executing a search warrant for a dwelling or checking the interior of a stopped automobile detain occupants of the dwelling or passengers of the automobile for a reasonable period, the agents did not act improperly in this case. *Michigan v. Summers,* 452 U.S. 692, 703–06, 101 S.Ct. 2587, 2594–96, 69 L.Ed.2d 340 (1981). No time was wasted. The officers' questions were very much to the point, and the answers—to a sports fan, at least—obviously left much to be desired. No more than nineteen minutes elapsed between the time when the officers went to room 114 and the time when they finished the task of filling out the consent form, reading it aloud, and securing Mr. Fresneda's signature. Each action taken by the agents represented a reasonable response to the situation as it unfolded. Neither the interrogation nor the search was excessive in length, under the totality of the circumstances, and the district court did not err in admitting into evidence cocaine found in a search to which Mr. Fresneda had given written consent. The district court found that "the written consent was voluntary on the part of Fresneda and binding on the remaining defendants." The district court's well-founded factual findings leave room for no other conclusion:

"The Court finds that the consent form was read to Fresneda and that he understood that he was under no obligation to execute it. The Court finds that Fresneda is fluent in the use of the English language and of at least average intelligence. The Court rejects, as unsupported, Fresneda's claim that he was so afraid that he executed the consent to search because he believed he had no choice. At all times, Fresneda, during the intrusion, conducted himself in an assured manner. He was addressed in conversational tones. The Court rejects Fresneda's testimony that he was confronted with a weapon held by Agent Lupo until he signed the consent form. The Court finds that Agent Modesitt informed Fresneda that if Fresneda refused to sign the consent form as was his privilege, that he, Modesitt, would attempt to secure a search warrant. Such an instruction does not taint the consent."

Mr. Fresneda probably took a calculated risk. He knew the cocaine was well hidden in the door panel, and if he pretended he had nothing to conceal it would be reasonable to hope that it might not be found. If he refused to consent to a search, on the other hand, he knew that the officers would apply for a search warrant. Assuming a warrant could be obtained, the odds that the cocaine would be overlooked could not have seemed very good. Mr. Fresneda gambled and lost; we are not prepared to declare that he won.

**IV**

■ Defendants Spinola and Blanco contend that there was insufficient evidence that they were guilty of the crimes of which they were convicted. (The jury found both men guilty of conspiracy and of possession of cocaine with intent to distribute it. 21 U.S.C. §§ 846 and 841(a)(1). Mr. Spinola was also found guilty of a violation of the Travel Act, 18 U.S.C. § 1952(a)(2).)

The government had the burden of proving that Spinola and Blanco "conspire[d] to commit [an] offense defined in this subchapter." 21 U.S.C. § 846. The "offense defined in this subchapter" was possession

of a controlled substance with intent to distribute. 21 U.S.C. § 841(a)(1). In order to prove the crime of conspiracy the government must show that the defendant knew of the conspiracy and knowingly and voluntarily joined it. *United States v. Christian*, 786 F.2d 203, 211 (6th Cir.1986).

There was ample evidence that Messrs. Spinola and Blanco knowingly and voluntarily joined an illegal conspiracy. Over a two-day period they cooperated with Fresneda in actions that resulted in the transportation of a large quantity of cocaine from Miami, Florida, to Erlanger, Kentucky. Someone in the Cincinnati area was awaiting their arrival and attempting to make contact with them. Mr. Blanco argues that his mere presence does not suffice to show that he was a member of the conspiracy, but the fact that he found it necessary to manufacture a false explanation for his presence in the Cincinnati area clearly shows guilty knowledge. The likelihood that Mr. Blanco was telling the truth when he volunteered, prior to the search of the car, that "[i]f there are any drugs in that car I know nothing about it" strikes us as approximately the same as the likelihood that $300,000 worth of drugs would have been left in the door panel of the rental car as a result of the forgetfulness of someone who had rented the car earlier. The question is whether there was "substantial evidence" to support the jury's conclusion. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Here there was.

That same evidence was sufficient to support the convictions for possession with intent to distribute. Mr. Fresneda does not deny, on appeal, that he possessed the cocaine with the intent to distribute it. Mr. Spinola provided the automobile with which the cocaine was brought up from Florida, and Mr. Blanco went along for a nonstop ride of some 1,000 miles. The latter two aided and abetted Fresneda in the commission of the offense, and thus were punishable as principals under 18 U.S.C. § 2(a).

■ Mr. Spinola was also convicted of a violation of the Travel Act, 18 U.S.C. § 1952. The jury thus found that he traveled in interstate commerce with an intent to facilitate the carrying on of an unlawful activity and committed a subsequent act in furtherance of that activity. See 18 U.S.C. §§ 1952(a)(3) and (b); *United States v. Alsobrook*, 620 F.2d 139, 141 (6th Cir.), *cert. denied*, 449 U.S. 843, 101 S.Ct. 124, 66 L.Ed.2d 51 (1980). There was evidence that Mr. Spinola traveled from Miami to Northern Kentucky with the intent to distribute cocaine when he arrived there, and made phone calls in furtherance of that intention. That is sufficient for a conviction.

## V

■ Mr. Spinola contends that *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), makes his conviction unconstitutional because the government failed to make timely production of an "exculpatory" DEA report on the post-arrest telephone calls. Like the district court, we disagree. Taken as a whole, the document in question tended to incriminate Spinola, not to exculpate him. Even assuming the document was exculpatory, moreover, defense counsel received it during trial in time to use it for cross-examination. There is no reason to think that the receipt of this report during trial rather than beforehand made the preparation of Spinola's defense so difficult that he was denied a fundamentally fair trial. The *Brady* doctrine does not require that the conviction be disturbed.

Finally, Mr. Spinola claims that the district court erred in refusing to sever his trial from Fresneda's. If they had been tried separately, Spinola argues, Fresneda would have testified on Spinola's behalf, as he did at the suppression hearings. (There Fresneda testified that Spinola was dropped off after renting the car and that he never again entered the automobile. When questioned further about the automobile, Mr. Fresneda invoked his Fifth Amendment privilege not to answer.)

■ Under Rule 14, Fed.R.Crim.P., a criminal defendant may justify a separate trial where he can show that a co-defendant would be willing to testify for him, would not invoke the Fifth Amendment privilege, and would exculpate the defendant. *United States v. Whitley*, 734 F.2d 1129, 1139 (6th Cir.1984). Here, although Fresneda

purported to waive his Fifth Amendment privilege, the waiver was illusory because it was conditioned upon his being tried before Spinola. We are not willing to read Rule 14 as a mechanism for alleged co-conspirators to control the order in which they are tried. Moreover, Fresneda's testimony was only minimally exculpatory. The most damaging evidence against Spinola was that there was cocaine in the automobile when it arrived in Northern Kentucky, that it was he who had rented the automobile, that there were phone calls for him in Northern Kentucky before and after the car's arrival, and that when he got to Northern Kentucky he asked for Fresneda. The proposed testimony dealt with none of this. The ends of judicial economy and efficiency were well served by trying the alleged co-conspirators together, see Rule 8(b), Fed.R.Crim.P., and the district court did not abuse its discretion in declining to sever the trials.

AFFIRMED.