**UNITED STATES of America**

v.

**Victor CLARKE, Defendant.**

**Crim. No. 91–0195.**

United States District Court, District of Columbia.

Oct. 29, 1991.

**8**

Mary–Patrice Brown, Asst. U.S. Atty., Washington, D.C., for U.S.

Michael C. Wallace, Sr., Asst. Federal Public Defender, Washington, D.C., for defendant.

Gino Josh Singer, New York City.

ORDER

REVERCOMB, District Judge.

Upon motions in this case by the defendant and his former co-defendant Gilberto Mendoza to suppress evidence and statements related to the defendants' arrests, this Court considered the testimony, evidence and arguments offered by all parties at a hearing on October 23, 1991. Based on this hearing, the Court denied from the bench the defendants' suppression motions, noting then that its written findings and conclusions would follow. Subsequent to the Court's ruling, defendant Mendoza entered an unconditional guilty plea. Defendant Clarke is now scheduled for trial on January 13, 1992. The Court's grounds for denying defendant Clarke's suppression motion are set forth below.

*Facts*

Sergeant Arthur Lawson of the Amtrak Drug Enforcement Unit appeared as the sole witness at the October 23 hearing. Sgt. Lawson testified that on March 13, 1991, at about 12:30 p.m., he and D.C. Metropolitan Police Detective Michael Bernier arrested the defendants in possession of some 50 pounds of cocaine. As part of his regular drug interdiction duties focused on Amtrak's overnight "Crescent" train from New Orleans to New York, Sgt. Lawson identified train reservation information pertaining to defendant Mendoza. Specifically, Sgt. Lawson observed that a person using a credit card in the name of Mendoza had made reservations on March 11 to take a one-way trip from New Orleans to New York City over the night of March 12–13, that this person had left a "call-back" telephone number for those reservations in the "(404)" area code—a location other than the departure city—and that he purchased the two reserved tickets one hour before departure and had upgraded to a sleeper car. Sgt. Lawson contacted the Amtrak agent who remembered selling tickets under the Mendoza reservations to two black males. The agent reported that the two men had duffel bags with them which they did not check. Based on this information,

Sgt. Lawson targeted the two passengers for questioning when the train reached Washington, D.C.'s Union Station, where Sgt. Lawson has conducted drug interdiction since October 1988.

When the Crescent arrived around noon on March 13, Sgt. Lawson and Det. Bernier spoke to the attendant of Crescent sleeping car No. 2000 and were told that Bedroom F on that car was occupied. The two officers then boarded the car and went to the adjacent Bedroom E, from which Sgt. Lawson could hear two men, through a movable fabric-covered partition separating the two rooms, speaking in English in Bedroom F. Sgt. Lawson then knocked at Bedroom F, identified himself at the doorway to Mr. Clarke as an Amtrak policeman and asked if he could speak to both defendants, who agreed.

Both Sgt. Lawson and Det. Bernier were dressed in plain clothes and neither displayed a weapon. Sgt. Lawson observed that the bedroom smelled of coffee and moth balls, two items often used to confound drug-sniffing dogs. Sgt. Lawson requested, examined and returned both defendants' train tickets, as well as a New York driver's license presented by Mr. Clarke and a credit card presented by Mr. Mendoza as identification. Det. Bernier remained in the hallway, watching through the open bedroom doorway, while Sgt. Lawson stood in the doorway, without blocking egress through it,[1] and conversed with the defendants in English.

Sgt. Lawson explained that his purpose in visiting the train compartment was drug interdiction, and he asked the defendants if they understood this purpose; both responded that they did. Sgt. Lawson then asked the defendants if either was carrying drugs, and both said they were not. He asked if they had any luggage, and Mr. Mendoza identified a green duffel bag on the floor. Sgt. Lawson asked if he could search the bag, and Mr. Mendoza said he could. Sgt. Lawson did not inform Mr. Mendoza that he had a right to refuse the search. Sergeant Lawson entered the 6-1/2 × 6-1/2 foot bedroom, rummaged through the green duffel bag and felt within it, among other things, a plastic garbage bag that was taped shut and contained both soft, pliable packages and firm-textured, paper-wrapped blocks that he believed contained narcotics. While the officer searched, Mr. Mendoza commented that his girlfriend had asked him to take some books back to New York; Sgt. Lawson replied to this that some objects in the bag did feel like books.

Mr. Clarke then identified a black duffel bag in the bedroom as belonging to him and, when asked for permission to search it, consented and handed the duffel bag to Sgt. Lawson. Mr. Clarke was also not told that he might refuse the search. Sgt. Lawson felt a plastic bag in the black duffel bag that contained packages similar to those he had felt in the green duffel bag, and during this search Mr. Clarke also commented that he was carrying books for Mr. Mendoza's girlfriend.

Having detected the plastic bags and the bundles they contained, the officers escorted the defendants and their bags from the train to an office at Union Station, where Det. Bernier cut into the bundles and found white powder in both bags that he field-tested and found to be cocaine. At this time, the officers formally arrested the defendants and advised them of their *Miranda* rights before taking them to the Metropolitan Police morals division, where the duffel bags were unpacked.

*Discussion*

No evidence was offered to contest Sgt. Lawson's account at the October 23 hearing. Mr. Clarke argues that his consent to be searched should not be deemed voluntary because Sgt. Lawson did not advise the defendants of their right to refuse the search and because their will to refuse without this advice was, under the confining circumstances in the sleeping cabin, overborne by the police presence there. Mr. Clarke further contends that probable

1. Sergeant Lawson testified that there was enough room for someone to walk by him in the 22-inch wide bedroom doorway.

cause arising from the search of Mr. Mendoza's bag [2] imposed a duty on the officers to formally charge Mr. Clarke and provide him with *Miranda* warnings before seeking his consent to search the black duffel bag. In support of this contention, Mr. Clarke points to his susceptibility to constructive possession charges once Mr. Mendoza's narcotics were found, and to Sgt. Lawson's testimony that, after searching the green duffel bag, he would not have allowed Mr. Clarke to leave the train car "without further questioning."

In its decision this summer in *Florida v. Bostick*, the Supreme Court reaffirmed that, even when police have *no* basis for suspecting an individual, they may (1) generally ask questions of him, (2) ask to examine his identification, and (3) request to search his luggage, "so long as the police do not convey a message that compliance with their requests is required." [3] —— U.S. ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). *Bostick* reiterated that the Fourth Amendment inquiry to be applied to persons confronted on public carriers remains the same as that to be applied to a person walking on the street; *i.e.*,

> whether a reasonable person [4] would have felt free to decline the officers' requests or otherwise terminate the encounter.... taking into account all of the circumstances surrounding the encoun-

ter.... Where the encounter takes place is one factor, but not the only one.

*Id.* 111 S.Ct. at 2387.[5] Other relevant factors have been held to include

> the time of day, ... the officer's tone of voice, and whether the officer displayed a weapon or handcuffs, wore a uniform, touched the individual without permission, threatened or physically intimidated him, or retained his identification or travel ticket.

*United States v. Lewis*, 921 F.2d 1294, 1297 (D.C.Cir.1990). Sgt. Lawson's testimony indicated that nothing in the officers' dress, demeanor, actions, or timing supports a contention that the defendants were "seized" when approached and asked if their bags could be searched or that their consent to be searched was coerced. In addition, the Court of Appeals for this Circuit has twice held that the presence of officers in the doorway of a train compartment does not itself signify either an intent to hold an interviewee inside or a bar preventing a reasonable person from declining to talk or from leaving. *See United States v. Tavolacci*, 895 F.2d 1423, 1425 (D.C.Cir. 1990); *United States v. Savage*, 889 F.2d 1113, 1115–18 (D.C.Cir.1989). The courts observed in these cases that the interviewees were in the cramped settings voluntarily and that there was nowhere else for the police to stand. *Id.; see also United*

---

**2.** Mr. Mendoza argued at the October 23 hearing, prior to his guilty plea, that what Sgt. Lawson *felt* in the green duffel bag was not clearly drugs, therefore could not yield sufficient probable cause to warrant Mr. Mendoza's arrest at Union Station, and therefore was *the predicate for an unlawful seizure* necessitating suppression of the subsequently discovered cocaine. Because this argument is not inconsistent with Mr. Clarke's contentions, the Court addresses it at page 11 *infra*.

**3.** Genuine consent to a warrantless search constitutes a waiver of 4th Amendment protections including the suppression of contraband uncovered in the search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973). The government argues correctly that the procedural safeguards set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) only come into play when a person is subject to both custody and interrogation. *Rhode Island v. Innis*, 446

U.S. 291, 297, 100 S.Ct. 1682, 1687–88, 64 L.Ed.2d 297 (1980). Thus, no duty to Mirandize these defendants arose unless and until a "seizure" occurred under the standards discussed herein.

**4.** The Court made clear that the " 'reasonable person' test presupposes an *innocent* person"; *i.e.*, whether a person carrying no contraband would feel free to avoid the search. *Id.* 111 S.Ct. at 2388 (emphasis in original).

**5.** *Bostick* restricted itself to rejecting a *"per se* rule" that the practice of "working the buses" (*i.e.*, random selection of persons on public carriers for questioning and consent search) is unconstitutional, and the Court reserved decision on whether the facts at issue there ("Two officers walked up to Bostick on the bus, asked him a few questions, and asked if they could search his bags") constituted an unlawful seizure. *Id.* at 2385, 2388.

*States v. Brady,* 842 F.2d 1313, 1315 n. 5 (D.C.Cir.1988).

■ Contrary to defendants' contentions, Sgt. Lawson was not obligated to inform them of their right to refuse to consent to a search, and the prosecution need not prove that the defendants knew of their right to refuse. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226–27, 249, 93 S.Ct. 2041, 2047, 2059, 36 L.Ed.2d 854 (1973); *United States v. Lloyd,* 868 F.2d 447, 451 (D.C.Cir.1989). This court also finds that, based on Sgt. Lawson's account of his conversations and what he overheard, the defendants' English skills were sufficient to enable their voluntary consent to be searched. *See United States v. Santiesteban,* 825 F.2d 779, 783 (4th Cir.1987); *United States v. Blanco,* 844 F.2d 344, 351 (6th Cir.), *cert. denied,* 486 U.S. 1046, 108 S.Ct. 2042, 100 L.Ed.2d 626 (1988). Moreover, the defendants' proffers during Sgt. Lawson's searches that their duffel bags contained books from Mr. Mendoza's girlfriend indicates "it was quite likely [they] believed that the agents would not find the [contraband] materials which ... were hidden....''; such a belief, or hope, of successful deception also bolsters the government's contention of voluntary consent. *United States v. Crespo,* 834 F.2d 267, 272 (2d Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988); *see also United States v. Olivier–Becerril,* 861 F.2d 424 (5th Cir.1988).

■ Finally, the Court finds that the bundles Sgt. Lawson felt during his searches of the duffel bags in the train compartment, combined with the odors of moth balls and coffee and other attendant circumstances, yielded sufficient probable cause for an experienced narcotics officer such as Sgt. Lawson to arrest both defendants. *United States v. Williams,* 822 F.2d 1174, 1182–84 (D.C.Cir.1987) (no warrant is needed for opening a container whose contents can become known through a lawful touching of the outside). As to Mr. Clarke's contention that Sgt. Lawson should have paused after searching the green duffel bag to formally arrest Mr. Clarke before pursuing any search of the black duffel bag, the Court finds that Sgt. Lawson's discovery of the first bundles of cocaine changed nothing from Mr. Clarke's perspective: Sgt. Lawson in effect played dumb, agreeing with Mr. Mendoza that books were inside his bag, and then properly proceeded to establish probable cause for arrest particular to Mr. Clarke.

Accordingly, based on the totality of the circumstances pertaining to the searches and arrests in this case as established by the uncontroverted and credible testimony of Amtrak Officer Lawson and by other evidence, it is hereby

ORDERED that defendant Clarke's motion to suppress is DENIED.