**UNITED STATES of America, Plaintiff,**

v.

**David Michael PARKE, Mark Kevin Kulczyski, Defendants.**

**No. 93–CR–50059–DT.**

United States District Court, E.D. Michigan, S.D.

Jan. 24, 1994.

---

Nancy Abraham, Asst. U.S. Atty., Flint, MI, for plaintiff.

Terrance P. Sheehan and Denise D. Couling, Grand Blac, MI, for defendants.

## OPINION AND ORDER

ROSEN, District Judge.

### I. *INTRODUCTION*

Defendant David Michael Parke has moved this Court to suppress drugs, firearms, and money seized as a result of Flint Police Officer Frank Sorensen's stop of Parke's car for failing to signal a left turn. Parke argues that Sorensen's stop for the traffic violation was pretextual. Moreover, Parke asserts that he did not consent to the search of his person and luggage.

The Court has carefully reviewed Parke's motion, and it also conducted a full evidentiary hearing on December 2, 1993. It is now prepared to rule on Parke's motion, and this Memorandum Opinion and Order sets forth that ruling.

### II. *FACTUAL BACKGROUND*

On July 9, 1993, a grand jury issued a two-count indictment against David Michael Parke and Mark Kevin Kulczyski. Count I alleged that both Defendants knowingly and intentionally possessed marijuana with intent to distribute in violation of 21 U.S.C. § 841. Count II alleged that Defendant Parke knowingly used and carried two firearms during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c).

The indictment arose out of the following facts: On July 1, 1993, at 10:30 a.m., Officer Frank Sorensen, a four-year veteran of the Flint Police Department's anti-drug unit, was on plain-clothes duty at the Knights Inn on Miller Road, Flint, Michigan. Defendants were staying at this motel, having checked in at 1 a.m. on the morning of July 1. Officer Sorensen observed as Mark Kulczyski paid the front desk to have his phone turned on. As Kulczyski was paying, Officer Sorensen noticed that he had a large amount of cash on him. Once Kulczyski went back to his room, Sorensen checked the registry and saw that Kulczyski had paid $85 for a two-night stay at the motel, all in cash. His checkout time, then, would have been sometime on July 2, 1993. Sorensen continued his surveillance of Kulczyski as he got into a Chevrolet, which bore Texas license plates registered to a Texas car rental agency. Kulczyski drove around to the back of the motel. There, Sorensen observed both Parke and Kulczyski as they put duffel bags and a footlocker into the trunk of the car; they then left the motel and proceeded eastbound on Miller Road. Sorensen pursued Defendants onto Miller Road in an unmarked car because he suspected Defendants were engaged in drug trafficking on the basis of the following information he had already accumulated: (1) the large amount of cash on Kulczyski, (2) the brief stay at a motel, (3) the use of a rental car, and (4) the re-loading of that car after only one night (actually, only nine hours) of what was to have been a two-night stay. As Sorensen pursued Defendants, he called Sergeant Blough and Officer Winch of the anti-drug unit to provide backup.

Defendants were travelling on eastbound Miller Road with Sorensen in pursuit at approximately 11:15 a.m., when, in an effort to turn around and head west on Miller, Defendant Parke turned left on Austin Parkway without signalling and then turned again into a Motel 6 parking lot. In the parking lot he was stopped by Officer Sorensen. Sorensen has testified that he stopped Defendants for two reasons: Parke's illegal failure to signal his left turn, and his suspicions of drug trafficking based on his observations at the Knights Inn.

At the time of the stop, Sorensen blocked Parke's car and placed his badge up against his car window. He motioned Parke to back the car up, which Parke did. Sorensen then left his car with his firearm drawn at his side and approached Parke's car. He identified himself verbally as a police officer and told Parke to place his car in a parking space at the motel. Sorensen then went back to his car, reholstered his firearm, and pulled into the parking space next to Parke. At that point he told Parke that he had made an illegal left turn, and he asked both Defendants for their licenses and for the car's registration.

Sorensen was later joined by Sergeant Blough and Officer Winch. The officers asked Defendants to exit their car. Sorensen then spoke separately with Kulczyski, and Blough with Parke.

Sorensen and Blough testified that they informed Defendants that they were anti-drug unit officers. When the officers asked Defendants separately if they had any narcotics, both said no. The officers also claim that Defendants each consented to a search of their persons, luggage, rental car, and motel room. Sorensen searched Kulczyski and found $487 in cash on him. He then went back to his car and began writing up a ticket for the failure to signal a turn. Blough and Winch conducted the rest of the search.

According to Blough, Defendants cooperated by identifying which items of luggage in the car trunk belonged to whom. Parke also indicated to him that he had firearms in his luggage. After searching Parke's person and luggage, the officers found the following: in one of Parke's duffel bags, two loaded semi-automatic pistols; in the same bag, several clips of ammunition for each; in the same bag, a small amount of marijuana, ostensibly for personal use; and on Parke's person, approximately $2700 in cash.

Blough and Sorensen testified that they then asked each Defendant separately about the locked footlocker in the car's trunk. Each claimed that it was not his, that he did not have keys to the lock, and that the police could search it. After opening the lock, Blough and Winch discovered some 30 pounds of marijuana.

Defendant Parke argues that the search of his person and effects was not consensual. According to Parke, when Sorensen first approached him, he was pointing his gun at Parke. Parke further asserts that the officers told him even before they initiated their search that he could not leave "until they were done" or "until their curiosity was satisfied." Parke states that this threat was backed up by the fact that it would have been physically impossible for him to leave when he and his car were surrounded by the police.

Before the officers began their search, Parke allegedly asked them if there was anything he could do to prevent it and was told "No" or "Not really." After the police searched Defendants' persons and luggage— and found the cash, guns, and a small amount of marijuana—Parke states that one of the officers asked if he could search the footlocker in the trunk of the car. Parke admits that he denied that he owned the trunk, but still claims that he refused to give consent to a search. The search nonetheless proceeded, Parke states, because he was told that the officers could get a search warrant and examine the footlocker in any case.[1]

After discovering the marijuana in the footlocker, the officers arrested both Defendants. At the time of the arrest, Officer Sorensen also gave Parke his traffic ticket. At the station, the officers interrogated Defendants following a reading of their *Miranda* rights. Kulczyski waived his rights and claimed that he was in Michigan to visit his jailed father and his mother's grave. He denied knowing anything about the marijuana in the footlocker. Parke refused to talk to the police without an attorney present. Significantly, the police found keys to the lock on the footlocker on Parke's person as part of a more thorough search at the police station.

At the hearing on this motion, Parke introduced into evidence the traffic ticket issued by Officer Sorensen. It bore the handwritten notation: "Dismiss w/o prejudice[;] out of jurisdiction[.] 7/12/93." The notation apparently was made by a magistrate acting within her authority. *See* Defendant's Hearing Exhibit B.

The traffic stop was indeed effected outside of Flint's city limits. Nonetheless, Officer Sorensen testified that he is also a Genessee County Deputy Sheriff, and that he, therefore, had the authority to make the stop and issue the citation. Sorensen further testified that based upon his own past practices, he believed at the time of the stop that he did have authority to enforce traffic laws in Genessee County, both inside and outside of Flint.

Parke's counsel represented that the magistrate had dismissed the ticket because of instructions from the Genessee County Sheriff's Department. Upon questioning by the Court, Sergeant Blough testified that the Sheriff's Department had rescinded the power to issue traffic tickets of certain local police officers who were also Genessee county deputy sheriffs. The rescission, however, affected only Montrose Township police officers;[2] according to Sergeant Blough, Flint police officers who were also Genessee County deputy sheriffs still had the authority to issue traffic tickets like the one in this case.

At the end of the hearing, the Court requested the parties to submit additional evidence that they might be able to obtain on the question whether Officer Sorensen acted within his proper authority when he stopped Defendants for failing to signal. No such supplementation has been provided.

### III. ANALYSIS

#### A. OFFICER SORENSEN'S STOP OF DEFENDANTS WAS NOT PRETEXTUAL.

Parke's primary argument to suppress the fruits of the July 1, 1993 search is that

---

1. Officer Sorensen testified that, regardless of Parke's testimony concerning his own consent, Kulczyski gave consent to search the footlocker. Parke called Kulczyski as a witness to testify at the suppression hearing. However, he appeared without counsel, and after being advised by the Court of his Fifth Amendment rights, he elected not to testify.

2. Sergeant Blough testified that the Sheriff's Department had received a number of complaints on the overzealousness of Montrose police officers who were also Genessee County deputies in issuing traffic tickets. The Department, therefore, rescinded the power of such officers to enforce the county's traffic laws.

Officer Sorensen's stop for a failure to use a turn signal was mere pretext for investigating his suspicions of drug trafficking. In light of the Sixth Circuit's recent decision, *United States v. Ferguson*, 8 F.3d 385 (6th Cir.1993) (en banc)—a case strikingly similar to this case in both its facts and the legal questions presented—the Court rejects Parke's contention.

In *Ferguson*, the full Sixth Circuit reversed a panel decision and affirmed the district judge's denial of a motion to suppress. The facts in *Ferguson* can be summarized as follows: At 1:30 a.m. on October 18, 1990, Officer Ernie Writesman of the Memphis Police Department noticed some odd behavior at a motel. Defendant Cecil Ferguson and another person, Leonard Lester, each drove separate cars into the motel parking lot. Ferguson left his car and asked directions to one of the rooms from a security guard talking to Officer Writesman. After Ferguson walked away from the security guard and Officer Writesman, the officer got into his car and drove to the front of the motel, passing Lester. Lester knelt down in his car as if attempting to hide. Writesman continued his observations of Ferguson and Lester, and he saw them drive around the motel in Lester's car to park in front of Room 410. Ferguson went into the room and came out a few minutes later. Ferguson and Lester then drove back to Ferguson's car, where he took out a briefcase and put it into Lester's car. The two then drove back to Room 410. Ferguson went in for a few moments with the briefcase, came out again with the briefcase, and then got into Lester's car. Lester and Ferguson drove off, leaving Ferguson's car in the parking lot. 8 F.3d at 386.

Officer Writesman followed them out into the street and noticed that Lester's car did not have a visible license plate—a violation of a Memphis traffic ordinance. Writesman pulled defendants over, and asked for Lester's license. Writesman then placed Lester in the back of his squad car and called for backup. After the backup arrived, Writesman went up to Lester's car and saw a pistol lying next to Ferguson, who was sitting in the passenger seat. Writesman arrested Ferguson for having an unconcealed firearm, seized the gun, and proceeded to conduct a full search of Ferguson's person and the briefcase incident to his arrest. The search revealed evidence of drug trafficking. Writesman did not issue a citation for failure to have a visible license plate. Indeed, he discovered upon closer inspection that there was a license plate for the car lying on the back shelf of the passenger compartment, although it was not in plain view. 8 F.3d at 387.

Ferguson moved to suppress the firearm and the drug trafficking evidence on the ground that Officer Writesman's stop was pretextual. A magistrate to whom the motion was referred recommended its denial, despite the fact that Officer Writesman testified that the "number one" reason he stopped Lester's car was because of the events he had observed in the motel parking lot. The district judge agreed with the magistrate judge, holding that Writesman had a reasonable suspicion for making the stop based on what he saw in the motel parking lot. Furthermore, the district judge concluded (1) that the stop was not pretextual because Writesman had probable cause to suspect a violation of the Memphis traffic ordinance, (2) that he had routinely made such stops, and (3) that a reasonable officer would have made such a stop. 8 F.3d at 387.

A panel of the Sixth Circuit originally reversed, but upon rehearing *en banc*, the full court affirmed the district court. Importantly, the court did not consider whether Writesman had a reasonable suspicion to make a stop because of the drug-dealing information he had gathered at the motel. 8 F.3d at 387 n. 1. Rather, the court based its decision on the lower court's finding that the stop for the traffic offense was not pretextual.

After a thorough review of the split in the circuits over pretextual stops, including the Sixth Circuit's own rather complicated precedent on the subject, the court announced a new test to be applied:

*We hold that so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does*

*not violate the Fourth Amendment. See United States v. Trigg,* 925 F.2d 1064, 1065 (7th Cir.) (it is enough that officer had probable cause to arrest and lawfully effected arrest), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991). *We focus* not on whether a reasonable officer "would" have stopped the suspect (even though he had probable cause to believe that a traffic violation had occurred), or whether this particular officer "could" have stopped the suspect (because a traffic violation had in fact occurred), but *on whether this particular officer in fact had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop. The stop is reasonable if there was probable cause, and it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop.* It is also irrelevant whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop.

8 F.3d at 391 (emphasis added).

Applying this test to the facts of the case, the *Ferguson* court held that Writesman clearly had probable cause to stop defendants because it was uncontroverted that the license plate of Lester's car was not in plain view as required by the Memphis ordinance. Thus, the stop was proper and the evidence seized as a result was admissible. 8 F.3d at 392–93.

▪ The instant case is on virtually all fours with *Ferguson.* In this case, as in *Ferguson,* the defendant moving to suppress evidence was under police surveillance for suspected drug-related activities *before* he was stopped on a traffic violation. Yet, *Ferguson* held that so long as the police officer has probable cause to make a traffic stop, it does not matter if he also has other motives. Parke does not contest that Officer Sorensen had probable cause to stop him for failing to signal his turn; indeed, there appears to be no question but that the turn was illegally made. Under *Ferguson,* then, Sorensen's stop was lawful.

There is, however, one wrinkle to this case that was not presented in *Ferguson:* the subsequent dismissal of the traffic ticket by the magistrate. Her ruling casts doubt not as to the validity of the *reason* for the stop, but as to whether it was properly authorized. Parke argues that because the stop was unauthorized in the first place, any evidence obtained as a result of it was unlawfully seized.

The Court notes that, at first blush, *Ferguson* seems to provide some support for Parke's argument. As noted in the quotation set forth above, *Ferguson* relied in part on *United States v. Trigg* in establishing the Sixth Circuit's new test for pretextual stop claims. *Trigg* held that a traffic stop was not pretextual if the officer had (1) probable cause to believe a traffic violation occurred, *and* (2) proper authority to effect the stop. 925 F.2d at 1065. However, although *Ferguson* cites *Trigg* favorably, the Court finds that the Sixth Circuit did not clearly adopt *Trigg*'s "proper authority" prong for pretextual stop analysis. *Ferguson* is simply silent on whether an officer who makes a traffic stop on probable cause must also be acting within his jurisdiction.

▪ Assuming for the purposes of this motion that both prongs in *Trigg* apply, the Court holds that under *Ferguson,* and on the facts of this case, the traffic stop for the illegal left turn was proper. Officer Sorensen offered live, uncontradicted testimony that he was a Genessee County Deputy Sheriff and, as such, had the power to make traffic stops outside of Flint city limits. The Court fully credits this testimony. The fact that the ticket itself was ultimately dismissed does not undermine the validity of the stop. (Indeed on this record, it appears that the magistrate may well have acted upon an erroneous assumption in dismissing the ticket.)

▪ But, even assuming, *arguendo,* that Sorensen did act outside of his jurisdiction, the Court believes that the "good faith" exception to the warrant requirement spelled out in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), should be extended to factual situations like the one presented in the instant case. In *Leon,* the

Supreme Court refused to exclude evidence that was the result of police officers' good faith execution of a warrant that turned out later to have been improperly issued. After conducting a balancing test of the costs and benefits of applying the exclusionary rule in such circumstances, the Supreme Court held that it should not apply. 468 U.S. at 917–23, 104 S.Ct. at 3418–20. *See also United States v. Chapple*, 36 M.J. 410, 413 (1993) (applying *Leon* to uphold unauthorized search because of officer's good faith belief in his authority to order such a search); *Colorado v. Lindsey*, 805 P.2d 1134, 1137 (Colo.Ct.App.1990) (affirming denial of a motion to suppress evidence seized pursuant to an extra-territorial arrest because there was no showing of willfulness); *Louisiana v. Matthieu*, 506 So.2d 1209, 1213 (La.1987) (applying *Leon* to hold that trial court should admit evidence seized through execution of a warrant outside of issuing jurisdiction); *Pennsylvania v. Fetsick*, 392 Pa.Super. 264, 572 A.2d 793, 797 (1990) (affirming trial court's denial of suppression motion based on a police violation of arrest statute). *Cf. Washington v. Bonds*, 98 Wash.2d 1, 653 P.2d 1024, 1032 (1982) (holding that officers' blatant disregard of the territorial limits of their authority did not warrant suppression of confession given after arrest; officers' neglect of interstate niceties did not pose additional intrusion into defendant's privacy).

In light of *Leon*, this Court will not exclude evidence from a search incident to a stop which a police officer quite reasonably believed to be within his authority to make. In the Court's opinion, Officer Sorensen reasonably relied on his status as a Genessee County deputy sheriff to give him the authority to make traffic stops outside of Flint city limits. The Court adds to this fact that the benefit of suppressing this evidence falls far short of its cost. While a suppression of the evidence in this case might conceivably ensure that police officers in this federal district will, in the future, make sure that they are acting within their jurisdictional boundaries before pulling over suspected traffic violators, application of the exclusionary rule in these circumstances would also significantly impede the truth-finding goals of our judicial system. *See Leon*, 468 U.S. at 906, 104 S.Ct. at 3412. Such an impediment is unwarranted, when, in cases such as the one presented here, the police officer reasonably believed he was acting within his jurisdiction. The Court will not, therefore, suppress the evidence seized in this case even if it was, or would have been, ultimately determined after the stop that Officer Sorensen acted outside of his jurisdiction when he made the stop.[3]

■ The Court adds that it believes Officer Sorensen had a sufficiently reasonable suspicion of drug trafficking to warrant a stop of Defendants' vehicle regardless of the traffic violation. Before Sorensen stopped Defendants, he knew (1) they were driving a car with Texas plates; (2) the car was rented; (3) Defendants stayed overnight in a motel; (4) they paid for their stay for two days in cash; (5) Defendant Kulczyski had a large amount of cash on him; and (6) after the first night, having paid for two nights, they were loading luggage, including a footlocker, into the trunk of the car.

Officer Sorensen and Sergeant Blough both offered testimony that drug traffickers that they have encountered in the past have come from Texas, have used brief stays at motels, have rented cars, and have carried considerable cash, all as part of their transactions. Given this uncontradicted testimony, the Court believes that Officer Sorensen had a reasonably articulable suspicion that Defendants were engaged in drug trafficking to warrant his stop of their car.

The Court draws support for this conclusion from *United States v. Blanco*, 844 F.2d 344 (6th Cir.), *cert. denied*, 486 U.S. 1046, 108

---

**3.** The Court wishes to stress that in arriving at this holding, it does not intend to open the floodgates to all manner of extra-jurisdictional stops and searches. Just as under *Ferguson* the stop in question must be based upon a probable cause belief that a traffic violation occurred, and just as under *Leon* an officer must have a good faith basis to believe the search warrant was validly issued, for a traffic stop to be lawful in circumstances such as this case, a police officer must (1) have probable cause to believe a traffic offense occurred, and (2) have a good faith basis to believe that he had jurisdictional authority to make the stop. Here, the Court finds both elements satisfied.

S.Ct. 2042, 100 L.Ed.2d 626 (1988). In that case, the Sixth Circuit upheld the temporary detention in a hotel room of defendants suspected of drug trafficking. The federal law enforcement officers in that case knew at the time they knocked on defendants' hotel room door that defendants had driven a rented car 1000 miles in one day from Miami, a drug source city, to Cincinnati Airport. Once there, defendants checked into an expensive hotel and paid in cash for their stay. The court stated:

It seems to us, as it seemed to the district court, that considering the totality of circumstances in the case at bar, Agent Modessitt had reasonable grounds for suspecting that Messrs. Fresneda and Blanco were trafficking in narcotics. Certainly the officer had no difficulty in articulating the basis for his suspicions. Like the suspects in *United States v. Knox, supra,* [839 F.2d 285 (6th Cir.1988)] the defendants were travelling from Miami, a well-known source of drugs. They had driven more than 1000 miles in a car that had been rented in Miami only one day before and was scheduled to be returned there only three days hence, just after the weekend. The men had driven to a not inexpensive airport hotel frequented primarily by businesspeople, and had paid for a single room in cash. They did not seem to be air travellers or conventional businessmen. The hotel's location was such that it was not normally patronized by people who had no occasion to be at the airport. Agent Modessitt—who had almost two decades of experience in drug law enforcement—was well aware that huge quantities of illegal drugs come from Latin America to Florida, whence such drugs are carried to other parts of the country by couriers. The couriers favor weekend travel, as Agent

Modessitt testified. They often meet their contact people at or near airports, and their travel tends not to be leisurely. Agent Modessitt could doubtless have hypothesized countless innocent explanations for Mr. Fresneda and his companion having driven so fast from Miami to an airport hotel in the wilds of greater Cincinnati, but it was hardly unreasonable for the officer to conclude, as he did conclude, that the likeliest explanation was the one the jury ultimately found to be correct: the men were drug couriers. Agent Modessitt's decision to have a word with the men in room 114 was eminently sensible.

844 F.2d at 350.

■ The facts of the instant case are similar to the passage above from *Blanco.* Officer Sorensen and his colleagues, like the agent in *Blanco,* were experienced drug interdiction officers. They knew that drug couriers used rental cars, travelled from Texas to Flint, stayed in local motels for brief periods of time, and carried a lot of cash. Defendants met this profile, and, like the agent in *Blanco,* Officer Sorensen acted upon his suspicions by stopping their vehicle. The Court believes, therefore, that this stop would have been lawful even if the traffic violation has never occurred.[4]

## B. *DEFENDANTS GAVE THEIR CONSENT TO THE SEARCH.*

The Court also holds that Parke's challenge of the search in this case following the traffic stop must fail. First, with respect to Parke's unlocked luggage, the Court finds that Parke gave voluntary consent to the officers to conduct the search.

The Supreme Court has stated that "[v]oluntariness [of consent] is a question of fact to

4. Parke also moved this Court to suppress any evidence that he met a drug courier profile. Parke relies on the assertion that the information on which Sorensen based his reasonable suspicion of drug trafficking is consistent with innocent behavior.

The Court fails to see the logic of this argument. In any case, the Court does not believe that the prejudicial effect of evidence indicating Parke met a drug courier profile substantially outweighs its probative value. Fed.R.Evid. 403. The evidence in question, namely, what Sorensen observed at the Knights Inn, will no doubt aid the jury in deciding the ultimate issue of this case: whether Parke was engaged in interstate drug trafficking. And the evidence is prejudicial to Parke in only a minor way. It does not hurt his defense nearly as much as the other, more damning evidence of drug-trafficking found during the officers' search of his person, luggage and footlocker. The Court is, therefore, unprepared to suppress the drug courier profile evidence given its definite probative value and its slight prejudicial effect.

be determined from all the circumstances...." *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973). *See also United States v. Dunson,* 940 F.2d 989, 994 (6th Cir.1991) (test for consent is would a reasonable, *innocent* person feel free to decline a police officer's request or otherwise terminate the encounter), *cert. denied,* —— U.S. ——, 112 S.Ct. 1488, 117 L.Ed.2d 629 (1992). In this case, the officers and Parke offer two very different versions of the events leading up to the search. Thus, a determination of whether lawful consent was given hinges upon an evaluation of the credibility of the witnesses.

The Court finds that Sergeant Blough provided credible testimony that Parke consented without objection to the search of his personal luggage, in which guns, ammunition, and a small amount of marijuana were found. The Court bases this finding on Sergeant Blough's directness and demeanor in answering questions both from counsel and from the Court.

In contrast, the Court finds that Defendant Parke was not a credible witness. On the stand, he admitted to making two false statements at the time of the search. First, he stated that he told Sergeant Blough that he did not have any narcotics when in fact he had some 30 pounds of marijuana in a locked footlocker in the trunk. Second, Parke denied ownership of the footlocker and also denied that he had keys to it when in fact he did have such keys. Given Parke's willingness to prevaricate when on the spot in the past, and his unconvincing demeanor of victimization at the hearing, the Court does not give any weight to his testimony.

 Turning to the search of the locked footlocker in the trunk, the Court initially notes that it is uncontested that Kulczyski gave his consent to search the footlocker after denying its ownership. This, in and of itself, would be sufficient consent to uphold the search of the footlocker, since it is unrebutted that Parke also disclaimed ownership of the footlocker. Beyond this, however, the Court again finds the officers' testimony regarding consent to be credible and that of Parke incredible. Even more fundamentally, the Court holds that Parke lacks standing to

challenge the search of the footlocker on the ground that by denying ownership he waived any protectible privacy interest he had in the footlocker. This principle is recognized in this circuit and others. *See United States v. Otobo,* 1993 WL 196053, *2, 1993 U.S.App. LEXIS 14738, *7 (6th Cir. June 9, 1993) ("Since defendant denied owning the suitcase he could have no legitimate interest in the privacy of its contents."); *United States v. Huffhines,* 967 F.2d 314, 318 (9th Cir.1992) ("Having disavowed any connection to the Blazer [automobile], [defendant] Huffhines may not challenge its search."). For these reasons, Parke's efforts to suppress the contents of the footlocker cannot succeed.

## IV. *CONCLUSION*

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's motion to suppress evidence is DENIED. Trial will proceed as to both Defendants.